THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WALTER LAMACKI, Defendant-Appellant.

First District (2nd Division)   No. 82—521

Opinion filed January 31, 1984.

404

Steven Clark and Kenneth Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Harry H. Semrow, Jr., Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Walter Lamacki (defendant) was charged by information with rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1), deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par. 11—3) and two counts of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2). On the State's motion, the two counts of armed violence were dismissed. On February 18, 1982, following a jury trial, defendant was found guilty of rape and deviate sexual assault. Defendant's motions for a new trial and his motion for relief notwithstanding the verdict were denied. Following a hearing in mitigation and aggravation, defendant was sentenced to serve two concurrent terms of 20 years in the Illinois Department of Corrections.

On appeal, defendant assigns as error: (1) the trial court's failure to suppress the identification testimony of complainant based upon allegedly "suggestive" photographic and lineup identification procedures; (2) the trial court's refusal to admit into evidence three "mug books" allegedly containing defendant's picture and a police "sketch" derived from a description of the assailant provided by complainant; (3) certain prosecutorial remarks made during closing argument; (4) the State's failure to prove defendant guilty beyond a reasonable doubt; and (5) the trial court's abuse of discretion in sentencing defendant to two concurrent 20-year terms of imprisonment.

Defendant was arrested on July 15, 1981, and charged with the July 14, 1981, rape and deviate sexual assault of complainant. The evidence elicited at the three pretrial hearings pursuant to defendant's motions to suppress complainant's identification testimony reflects the following:

On July 14, 1981, at about 10 p.m., the 25-year-old complainant was returning home from the White Hen Pantry store located at the corner of Flossmoor and Pulaski streets in Country Club Hills, Illinois, when she was accosted by a man carrying a knife. She was raped and forced to perform an act of deviate sexual conduct. Following her attack, complainant returned home and telephoned the Country Club Hills police station. When the police arrived, complainant gave to them a general description of her attacker. On July 15, 1981, at about 10 a.m., complainant went to the Country Club Hills police station. While at the station, Police Sergeant William Schultz (Sergeant Schultz) showed complainant three "mug books" containing "hundreds and hundreds" of pictures. According to Sergeant Schultz, the books should have included two sets of photographs (front view and profile) of defendant. Complainant was unable to identify her attacker in the "mug books." However, she did provide a detailed de-

scription of her assailant to a police artist who made a "composite" of the assailant from an "identification kit."[1] Complainant described her assailant as "five-eight or six-two, Caucasian" with shoulder length blonde hair, a moustache and a beard. She also stated that her attacker had "Wally" tatooed on his lower arm, although she could not recall which arm. Complainant testified at trial that she thought her assailant had a full "blondish" or "reddish" beard.

Sergeant Schultz testified at the suppression hearings to the following:

On July 15, 1981, at about 3 p.m., he discussed this rape incident with another police person. As a result of this discussion the officers were of the impression that they knew a man who "fit the composite" drawn by the police artist from complainant's description. Although complainant was "dissatisfied" and questioned the accuracy of the "composite," the police officers believed that defendant fit the description and the composite. At about 3:30 p.m. that same day, Sergeant Schultz and a second officer went to defendant's condominium at 4110 West 102d Place in Country Club Hills, about 2½ blocks southwest of the White Hen Pantry store near which the instant crime took place. Sergeant Schultz and defendant "had a conversation" following which defendant was "transported" in a police vehicle to the Country Club Hills police station.

At the time defendant was taken to the police station, Sergeant Schultz did not consider him to be "in custody." A "polaroid" photograph of defendant was taken by Sergeant Schultz at the police station and at about 4:30 p.m. he took this photograph, along with eight others of different men, to complainant's home. He did not tell complainant that he believed her assailant's photograph was among the nine. She looked at each individual photograph and when "she came to [defendant's] photograph she set it down on the table and said, 'That's him.' "[2] Sergeant Schultz returned to the police station and at about 5 p.m. on July 15, 1981, placed defendant under arrest.

John A. McGuire, one of defendant's attorneys throughout the pretrial stage of the prosecution, testified at the suppression hearing held on November 25, 1981, to the following:

On July 17, 1981 (it appears from McGuire's testimony that he was in fact referring to the events which occurred on July 15, 1981),

---

[1] An "identification kit" consists of slides of various parts of the face from which a composite likeness of an offender is derived rather than an artist's free hand drawing of an offender.

[2] Complainant was also shown a photograph of defendant's tatoo. She later stated, however, that she identified defendant "from his face."

he received a telephone call from defendant who told McGuire that he was "locked up in Country Club Hills." Defendant asked McGuire to represent him. At about 6 p.m. that day, McGuire telephoned the Country Club Hills Police Department and spoke with Sergeant Schultz. Sergeant Schultz told McGuire that defendant "was incarcerated and that he was charged with rape, and that they were going to conduct a lineup." McGuire told Sergeant Schultz that he "wished that he would not talk to defendant" and "asked him to delay any line-up until [McGuire] got there." McGuire acknowledged that Sergeant Schultz "may" have told him a lineup would be conducted at 6:30 p.m. Sergeant Schultz later testified that he in fact told McGuire that a physical lineup was going to be held at 6:30 and he asked McGuire "if he wanted to be present." McGuire responded, "I will be there."

A lineup was conducted at about 6:45 p.m.; McGuire arrived at the police station at approximately 7:15 or 7:30 p.m.

In the lineup defendant elected to stand at the far left. He was dressed in the same clothes he had worn when Sergeant Schultz took the "polaroid" photograph which Schultz showed to complainant two hours earlier. Defendant was dressed in a T-shirt with an emblem containing the phrase "A Friend In Weed." No other man in the lineup wore a similar T-shirt although others did wear "pull-over" T-shirts. One other man in the lineup had a visible tatoo on his arm.

Two hours after complainant identified defendant from his "polaroid" photograph as the man who attacked her, she also identified him in the lineup. Although complainant had described her attacker as a man with a "full" beard, Sergeant Schultz described defendant's facial appearance on July 15, 1981, the day following the instant crime, as a "moustache that comes down below his lower lip and a slight goatee *** kind of like a Van Dyke goatee on his chin."

After the lineup was conducted and defendant had been identified by complainant, he was advised of his *Miranda* rights. Defendant acknowledged that he understood these rights and agreed to talk with Sergeant Schultz and an assistant State's Attorney who was present. After a few questions were asked, however, defendant refused to answer further questions until he spoke with his lawyer.

In argument on his pretrial motion to suppress complainant's identification testimony, defendant asserted that because the lineup was conducted in the absence of his counsel and he was questioned further after the police were asked by defense counsel to delay such activity, defendant was denied his right to the assistance of counsel during a "critical stage" of a criminal prosecution; that the use of a "polaroid" photograph, which was over-sized in comparison to the

other photographs viewed by complainant, was "highly suggestive" and, therefore, prejudicial to defendant; and that the lineup procedure, in which defendant wore the same clothing he wore in the photograph shown to complainant by Sergeant Schultz about two hours prior to the lineup, was "highly suggestive and prejudicial."

After argument, the trial court denied defendant's pretrial motions, finding that "the failure of defendant's lawyer to appear at the time he apparently agreed to appear cannot be considered as a denial of the right to counsel"; that defendant was apprised of his *Miranda* warnings; and that the court could not "conclude that there was anything suggestive or impermissible" about the photographic identification or the physical lineup identification.

When defendant's trial began on February 11, 1982, he renewed his motion to suppress complainant's identification testimony. Defendant's motion was again denied.

The complainant (a black woman) testified to the following:

On July 14, 1980, she lived in Country Club Hills with her fiance and her children. As she returned home from shopping at the White Hen store, she walked westward on the north side of Flossmoor Road. A "guy" jumped out of some bushes and yelled, "Nigger, me and you tonight, I'm going to rape you." She started to run back toward the White Hen because she had seen a uniformed policeman in the store and a Country Club Hills police car outside the store. As she ran, however, the man came up behind her, tripped her and she fell. The man threatened her with a knife, put his arm around her neck and "pulled her off the road" to a garden area about 50 feet from the street. The assailant repeatedly said: "Me and you, I'm going to rape you tonight. The niggers do it all the time." She was forced to disrobe and the assailant "straddled" her. He told her to "suck his penis." When she refused, he "grabbed the top of [her] head and forced her to suck it." He unbuckled his pants and pushed them down. He forced his penis into her mouth. He then "put his penis into [her] vagina and he ejaculated."

The assailant then told complainant she could dress and leave. As she left, he followed her for a short distance. The assailant asked her name and she replied "Betty." Complainant asked her attacker if he knew her; he responded that he knew her from "the store." As complainant reached the corner of Flossmoor and Cypress, the assailant said he was going the other way and he left.

Complainant identified defendant in court as her assailant. She stated that the garden area to which defendant "pulled her" was lit by the lights of the White Hen store, the street lights and a light on a

building near the garden area. She was also able to see his face as he stood under a street light when he followed her to the corner of Flossmoor and Cypress after the attack. She recalled that as he grabbed her initially she saw a tatoo on his lower arm, but she could not recall which arm it was or the design. Complainant recognized defendant as a man she "caught a glimpse" of in the White Hen store when she was at the cash register shortly before she was attacked.

Following the attack, complainant returned home and telephoned the police. When the police arrived, she described her assailant. She refused to accompany the police to the hospital until someone was available to tend her children. When her fiance returned home about 1:30 a.m. the next morning, July 15, 1981, he took her to South Suburban Hospital. Prior to going to the hospital, she showered and changed clothes but "didn't take a douche."

At the hospital complainant was examined by Dr. William Hughes. He testified that he performed a "general medical examination" and obtained specimens required by the "Rape Examination Kit" (sometimes referred to as a "Vitullo Evidence Kit"). Such specimens include swabs from various areas of the victim's body including the vaginal area and the mouth. In addition, samples of complainant's blood and pubic hair were collected. Dr. Hughes observed no "gross abnormalities, bruises or scratches" on complainant's body.

Patricia Hamby (Hamby), a forensic scientist employed by the Illinois Department of Law Enforcement in Joliet, testified as an expert to test results of the blood type and body-fluid characteristics of defendant and complainant. From her findings Hamby concluded that defendant's blood type and body-fluid characteristics were not particularly unusual but were representative of 12% of the Caucasian male population.

Hamby examined People's Group exhibit No. 2 (complainant's leotards, a red belt and a pair of slacks) and stated that when tested "there were chemical reactions *suggesting* the presence of semen but [Hamby] could not confirm" this and the test was "inconclusive." People's exhibit No. 1—A (a white panty worn by complainant the night she was attacked) was examined by Hamby and she stated that here "semen was identified." The seminal material was further examined and found to be "consistent with the seminal material from a non-secretor" which corresponded with those characteristics found in defendant.

The trial court denied defendant's motion to strike Hamby's testimony concerning laboratory tests which she did not herself perform.

Defendant presented two alibi witnesses, David Puikis and Duane

Thomas Terrell.

David Puikis testified that on July 14, 1981, he was at his home at 15507 Ridgeway, Markham, Illinois. He was hosting a "card" party for about 15 to 20 people. Defendant arrived at the party between 10 p.m. and 11 p.m. and remained for "a couple of hours." Puikis was unable to remember whether defendant was bearded that night, and during cross-examination Puikis admitted that he was "probably pretty well inebriated" and because he was not "paying attention," he could not say "definitely" what time defendant arrived or left.

Duane Thomas Terrell testified that he knew defendant for about one year but had only "seen" him on four occasions. Terrell lived across the street from Puikis' house and arrived at the party at about 9:30 p.m. Although he did not recall if defendant arrived at the party alone, Terrell stated that he was "positive" that defendant arrived at 10 p.m. During cross-examination Terrell admitted that he "estimated" defendant's time of arrival as 10 p.m. and that on July 15, 1981, the day after the crime, he had told a police officer that defendant arrived at the party between 10 p.m. and 11 p.m. Terrell stated that defendant did not wear a beard on the night of July 14, 1981, but he was unable to recall how defendant was dressed.

The last defense witness was Adam Kabala, the owner of the White Hen Pantry store near where the instant crime occurred. He stated that he saw defendant in the store "a couple of times" on July 14, 1981, and although he was in need of a shave he did not have a full beard. Kabala also stated that he did see a police officer in his store that evening but did not know if the officer and defendant were present at the same time.

The trial court denied defendant's motion to admit into evidence the three "mug books" which complainant had reviewed and the police composite sketch derived from her description of her assailant. Closing arguments were made and the jury instructed. After approximately three hours of deliberation, the jury found defendant guilty of rape and deviate sexual assault.

A presentence report was ordered by the court. On February 26, 1982, after defendant's motions for a new trial and for relief notwithstanding the verdict were denied, a hearing in mitigation and aggravation was held. Defendant was then sentenced to serve two concurrent 20-year terms of imprisonment. Defendant appeals his conviction and his sentence.

## I

Initially, defendant contends that the trial court erred in failing to

suppress complainant's identification testimony. Defendant urges that the identification was based upon "highly suggestive" photographic and lineup procedures which amounted to a denial of due process. Defendant argues that (1) the initial identification was made "from a batch of nine photographs" shown to complainant when defendant was already in police custody and a lineup could have been held; (2) the use of a "polaroid" photograph of defendant which was larger and "newer" than the other photographs in the array was "highly suggestive"; and (3) during the subsequent lineup, defendant was wearing the same clothes he wore when his photograph was taken and was shown to complainant two hours before the lineup.[3]

It is well established in Illinois that the determination as to whether a pretrial confrontation in a specific instance is " 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process *** depends on the totality of the circumstances surrounding it' [citation], and defendant bears the burden of proving that such a confrontation resulted in a denial of due process [citations]. In order to sustain this burden, the totality of the circumstances must not only demonstrate suggestiveness [citations], but also show a substantial likelihood of misidentification ***." *People v. Rosa* (1981), 93 Ill. App. 3d 1010, 1014, 418 N.E.2d 124.

It has been held that there is "no constitutional impediment to the use of photographs *** despite the recognition that there is a risk of misidentification when the procedures are improperly employed." *(People v. Kubat* (1983), 94 Ill. 2d 437, 471, 447 N.E.2d 247.) If the suspect is in custody, however, and a lineup is "otherwise feasible," our supreme court has "generally disapproved of the use of photographs as a basis of identification, absent extenuating circumstances justifying their use." *People v. Kubat* (1983), 94 Ill. 2d 437, 471, 447 N.E.2d 247.

Defendant in the instant case contends that no extenuating circumstances here existed which justified the use of the photographic identification procedure. He urges that because he was "in custody" and a lineup was feasible, the use of what he terms a "highly suggestive" polaroid photograph was unwarranted. Although the photographs in question have not been made a part of the record on appeal,

---

[3]The State argues that defendant's objections to complainant's identification testimony is waived by defendant's failure to specifically preserve that issue in his written post-trial motion. (*People v. Edwards* (1978), 74 Ill. 2d 1, 4, 383 N.E.2d 944.) Although defendant's post-trial motion alleged "general" error and may be subject to waiver, we will address the merits of defendant's contention.

we note that courts in Illinois have held that the use of different photographs in the same array (*i.e.*, "polaroid" and standard "mug shots") "does not automatically render a photo suggestive: ***. Different need not be equated with suggestive." *People v. Bryant* (1983), 94 Ill. 2d 514, 520, 447 N.E.2d 301.

In any event, even evidence which results from an unnecessarily suggestive identification may be admissible at trial if it is reliable. (*People v. Rosa* (1981), 93 Ill. App. 3d 1010, 1015, 418 N.E.2d 124.) "*Reliability* is the most important factor in determining the admissibility of identification testimony." (Emphasis added.) (*People v. Kubat* (1983), 94 Ill. 2d 437, 473, 447 N.E.2d 247.) The reliability of the identification involves an evaluation of the following factors:

> " '[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and length of time between the crime and the confrontation.' "
> *People v. Rosa* (1981), 93 Ill. App. 3d 1010, 1015, 418 N.E.2d 124.

■ The evidence here indicates that complainant had ample opportunity to view the defendant under "lighted" conditions during and immediately after the crime. Complainant's testimony was uncontradicted that they stopped and spoke to each other "under a street light" at the corner of Flossmoor and Cypress streets. Although complainant's initial description of her assailant differed somewhat from that of defendant's actual characteristics, her identification of him on the day following her attack was certain and unwavering.

The trial court ruled that the photographic array and lineup from which complainant identified defendant was not so suggestive as to warrant suppression of complainant's identification testimony. From our review of the totality of circumstances we conclude that defendant failed to establish that the procedures employed by the police in this case denied him due process. The trial court did not, in our opinion, err in denying defendant's pretrial motion to suppress complainant's identification testimony.

Defendant also contends that the identification testimony should have been suppressed because he was denied his right to the presence of counsel at the lineup. At that time defendant had been arrested, given *Miranda* warnings and had contacted his attorney who advised police that he "intended" to be present at the lineup.

When the lineup was being conducted, no formal charges had yet been filed against defendant. The State asserts that it had not yet

"committed itself to prosecute" defendant and no adversary judicial proceedings had been initiated. The State contends, therefore, that defendant's right to counsel had not yet attached.

■ "It has been established that the right to counsel attaches to 'lineups conducted after the initiation of adversary judicial criminal proceedings against an accused by whatever means.' [Citation.] A defendant does not have a constitutional right to counsel at a pre-indictment lineup unless adversary proceedings have been initiated such as by formal charge, preliminary hearing, indictment, information or arraignment. [Citation.] The right of counsel does not arise merely because when the lineup was held, defendant was in custody ***." *People v. Logan* (1983), 117 Ill. App. 3d 753, 759, 453 N.E.2d 1317, citing *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.

■ In *Logan* a lineup was held despite defendant's alleged request that such lineup be delayed until his attorney arrived. In the case at bar a lineup was likewise conducted despite the request of defendant's attorney that the lineup be delayed until he arrived. At the time this lineup was conducted, however, no adversary judicial proceedings had been initiated against defendant. We agree, therefore, that defendant's right to have counsel present during the lineup had not yet attached.

## II

Defendant next contends that the trial court erred in refusing to admit into evidence a police "sketch" derived from a description of the assailant provided by complainant and three "mug books" which, according to Sergeant Schultz, "should have" contained defendant's photograph. Defendant argues that this action by the trial court prevented the jury from judging the credibility of complainant's identification testimony "in a realistic light" and thereby prejudiced the defense.

At trial, Sergeant Schultz testified that the "mug books" should have contained two sets (frontal and profile views) of defendant's photographs, but he could not say with certainty that they were in fact present in those books.

Defendant contends that whether his photographs were contained in the "mug books" is a question to be determined by the jury. Defendant's purpose, however, appears to be an attempt to have the "mug books" admitted to allow the jury to judge the credibility of complainant's identification testimony. At trial, complainant stated that, after reviewing the photographs in these books, she was unable

to identify her assailant. The trial court ruled the mug books inadmissible because the evidence was "not certain nor definitive on the question of whether or not at the time complainant viewed the 'mug books' *** the photograph of [defendant] was either in once or twice." The admission of these books, the court explained, "would be extremely prejudicial and inflammatory and adverse to defendant."

■ "Whether evidence proffered by a defendant is relevant is a question addressed to the sound discretion of the trial court." (*People v. Boyd* (1980), 81 Ill. App. 3d 259, 263, 401 N.E.2d 304.) The trial court may reject evidence which it determines to be "of little probative value because of its remoteness, uncertainty, or conjectural nature." *People v. Boyd* (1980), 81 Ill. App. 3d 259, 263, 401 N.E.2d 304.

■ Our review of the record persuades us that in this instance the trial court did not abuse its discretion in rejecting the "mug books."

Defendant also alleges error in the trial court's failure to admit into evidence the police artist's sketch derived from complainant's description of the suspect and the use of an "identification kit." Complainant stated at trial that she was not "satisfied" with the sketch and said that it did not look like her attacker or defendant. Defendant's stated purpose in offering the sketch was to impeach complainant's alleged "inconsistent description."

It is well established that "a witness may be impeached by extrinsic proof that he made a statement out of court *inconsistent* with his in court testimony. The prior statement has to be inconsistent ***." (Emphasis added.) E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 801.9 (1979).

■ Defendant maintains that because it was inconsistent with complainant's identification testimony at trial, the sketch was relevant and admissible. A review of the record, however, indicates that complainant did not at any time consider the sketch to accurately represent her attacker. Her original description of her assailant and her subsequent identification testimony was not inconsistent with her prior expression of dissatisfaction with the police artist's sketch. The trial court, therefore, properly excluded the police artist's sketch.

### III

Defendant next assigns as error certain remarks uttered by the prosecution during closing argument. Defendant contends that the remarks relating to the testimony of the State's expert witness, Patricia Hamby, were so prejudicial as to deny him a fair trial. The allegedly

prejudicial remarks complained of were not, however, specified in defendant's written post-trial motion for a new trial, nor did defendant submit to the court any oral post-trial motion.

 The general rule followed by Illinois courts is that "failure by the defendant to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal on review." (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) This waiver rule applies to constitutional, as well as nonconstitutional questions. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) The central purpose of the waiver doctrine is to allow the trial court an opportunity to correct any alleged error. (*People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 720, 431 N.E.2d 1154.) Courts of review, however, as a matter of grace in a case involving deprivation of life or liberty in which the evidence appears closely balanced, may take notice of errors appearing upon the record " '*** which deprived accused of substantial means of enjoying a fair and impartial trial, although no [alleged errors] were preserved or the [alleged errors are] imperfectly presented.' " *People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856.

In the instant case Patricia Hamby, a forensic scientist, testified as an expert. Following a highly technical description of general blood types and body-fluid categories, Hamby stated her opinion as to defendant's and complainant's blood types. Hamby opined that test results comparing defendant's blood type and body-fluid characteristics with seminal material deposited on complainant's panty during her July 14, 1981, attack indicated that such seminal material was consistent with defendant's characteristics. She stated further, however, that similar characteristics are present in "approximately 12 percent of the male Caucasian population."

Defendant assigned error to the following prosecutorial remarks based on Hamby's testimony:

> "She [Ms. Hamby] told you *** that Mr. Lamacki is one of the twelve percent, one person who constitutes twelve percent of the white population *who could have deposited that semen in her body.*
>
> She told you that semen, left in the vaginal area of [complainant], and in the panties worn by [complainant] on July 14th 1981, could have come from only twelve percet [*sic*] of the population that could have committed these acts. But, then you have to go further. What part of that twelve percent of the male, white population, happens to live two blocks from the scene of the crime? What part of that twelve percent of the

male, white population, was in the White Hen Pantry at 10:00 o'clock that evening? Go further.

What part of that twelve percent of the white population who could have raped [complainant], was picked out of a photo-line-up the next day?

Go further than that? What part of that twelve percent was also identified in a physical line-up? Only one part of that twelve percent, that's him. Walter Lamacki. That is the one that raped [complainant].

Look at the facts, and the evidence that you have heard. Again, there is only a twelve percent of this population that could have committed this crime, only twelve percent. Start looking into the evidence, and narrow that twelve percent." (Emphasis added.)

Defendant argues that these remarks clearly indicate that "the State's Attorney deliberately misstated the evidence."

■■ It has been held that "[f]or improper comments by the prosecutor *** to be sufficient to merit reversal they must be of a substantial magnitude when viewed in light of the entire record and argument" and must "result in substantial prejudice to the accused." (*People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 723, 431 N.E.2d 1154.) Where the alleged improper comments do not constitute a material factor in defendant's conviction or are of such a minor character that prejudice to defendant is not their probable result, the verdict will not be disturbed. *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 723, 431 N.E.2d 1154.

■■ Although we agree that the prosecutor's remarks might better not have been made, our review of the entire record in the case at bar compels our conclusion that such remarks were not so prejudicial as to constitute reversible error.

## IV

Defendant next contends that the State failed to prove him guilty beyond a reasonable doubt. Defendant asserts that complainant's identification testimony was "highly suspect" and that the scientific evidence introduced by the State was "nearly worthless."

■■ ■ "A court of review will not reverse [a jury] finding unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to raise reasonable doubt of guilt." (*People v. Stepney* (1977), 46 Ill. App. 3d 328, 330, 360 N.E.2d 1206.) "It is well settled that a positive identification by even one witness, who had a good opportunity to observe an accused in terms of length of time, proximity

and lighting conditions is sufficient to sustain a verdict of guilty." *People v. Stepney* (1977), 46 Ill. App. 3d 328, 330, 360 N.E.2d 1206.

Defendant urges that "inconsistencies" and "conflicts in testimony" at trial raise reasonable doubt of his guilt.

Illinois courts have held that "minor inconsistencies in a rape complainant's testimony do not constitute grounds for reversal. * * * '***[M]inor variances in testimony may occur, and if so, such variances constitute mere discrepancies going only to credibility.'" *People v. Rankin* (1979), 73 Ill. App. 3d 661, 664, 392 N.E.2d 288.

▮▮ Defendant has not demonstrated the existence in this record of evidence sufficient to raise a reasonable doubt of his guilt. Such minor inconsistencies in complainant's testimony as are noted and such minor conflicts which may exist between complainant's testimony and that of other witnesses relate only to the weight to be accorded such testimony. It appears that the jury rejected the testimony of defendant's alibi witnesses and found complainant's testimony more credible. There was in our opinion sufficient evidence, if believed by the jury, to support its verdict.

## V

Finally, defendant contends that the trial court erred in sentencing him to two concurrent 20-year terms of imprisonment.

Defendant urges in his brief that, in view of the fact that complainant "suffered no physical harm" during the attack and because of his potential for rehabilitation, as indicated by his expressed desire to learn a trade while imprisoned, such a severe sentence was not warranted and should be reduced. At the sentencing hearing, defendant urged that he be sentenced to the minimum sentence of six years.

The State argues that complainant escaped "physical injury" only because of her acquiescence to defendant's threats made with a knife. The State urges that the "acts performed were vicious and spiteful" and that "the occurrence of physical injury is not required in aggravation in order to impose a sentence greater than the minimum."

On February 26, 1982, a hearing in mitigation and aggravation was conducted. At such hearing the court stated to the defendant: "The fact that you are on probation greatly affects my judgment * * *."[4] The court further stated that "to assess the minimum would be

---

[4]The record does not reveal the nature of defendant's 1979 conviction for "assault." Although at the sentencing hearing the prosecution argued that defendant was on probation for "aggravated assault," we are unable to determine from the record the validity of the prosecution's argument. The record reflects only that on the date of the instant offenses, defendant was on probation for "assault."

a flagrant disregard for the sanctity and the right of the victim to walk the streets of a south suburban community ***." The court characterized defendant's crime as an offense "that cries out for punishment" and "must be discouraged."

It is well established in Illinois that, absent an abuse of discretion, courts of review "will not substitute [their] judgment for that of the trial court merely because [they] would have balanced the appropriate factors differently if the task of sentencing had been [theirs]." *People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541.

The trial court, in our opinion, sought to "balance the appropriate factors" in sentencing the defendant. The sentence imposed was well within the 6- to 30-year limit authorized by statute. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(3).) Under these circumstances, we cannot conclude that the trial court abused its discretion.

For the foregoing reasons, we affirm the jury's verdict and the sentence imposed by the trial court.

Affirmed.

HARTMAN, P.J., and STAMOS, J., concur.