THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BOBBY JAMES DU PREE, Defendant-Appellant.

Second District   No. 2—86—0105

Opinion filed October 7, 1987.

954

G. Joseph Weller and Michael F. Braun, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Lori J. Miller, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Bobby James DuPree, was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(1)), and aggravated battery (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(1)), following a jury trial in Winnebago County. On appeal, defendant raises four issues for review: (1) whether he was proved guilty beyond a reasonable doubt; (2) whether the warrantless search of his automobile was unconstitutional; (3) whether the trial court erred in refusing to delete a portion of the jury instruction defining sexual penetration; and (4) whether the criminal sexual assault law is unconstitutional. We

affirm.

On July 23, 1985, a two-count information was filed charging defendant with aggravated criminal sexual assault and aggravated battery. The aggravated criminal sexual assault count alleged that on July 7, 1985, the defendant committed an act of sexual penetration by the use of force upon Geraldine Hawthorne with the use of a dangerous weapon, namely, a knife. The aggravated battery count alleged defendant on the same day committed a battery upon and caused bodily harm to Geraldine Hawthorne while using a deadly weapon, namely, a brick.

Prior to trial, defendant filed, *inter alia*, a motion to suppress certain physical evidence obtained during a warrantless search of defendant's automobile. The court denied the motion.

At trial, the complainant, Geraldine Hawthorne, testified that on July 6, 1985, she and her friend, Marita Warren, arrived at the J & B Tap (Tap) in Rockford at approximately 11:30 p.m. and remained there until the Tap closed at 2 a.m. the next day. The complainant consumed six drinks of brandy and water while at the Tap. When the Tap closed, complainant and Warren proceeded next door to a restaurant. A black male, identified by complainant as defendant, sat down at their table and began a conversation with Warren. Complainant had not seen defendant before. Sometime later, complainant walked out of the restaurant to get some fresh air. Defendant followed her. Once outside, complainant prepared to smoke a cigarette. Because she did not have any matches, complainant asked defendant for a match for her cigarette. Defendant responded he had one in his car. Complainant followed defendant to the car and entered the passenger side at his invitation. Hawthorne carried a purse with her when she entered defendant's car. The purse contained her keys, identification, and makeup. She identified a lipstick and eyebrow pencil as belonging to her. As she waited for a light, defendant started the car and drove off. After telling her not to say anything, and while still driving, defendant reached under the seat and produced a knife. Holding the knife to complainant's neck, defendant told her that if she tried to scream or escape from the car he would kill her.

The defendant drove to a secluded area, stopped the car, and ordered complainant to lie down on the car seat. Defendant then pulled down his trousers and removed complainant's slacks and pantyhose. He then inserted his penis into complainant's vagina for approximately five minutes. Complainant was not sure if defendant ejaculated. At some point, defendant had placed the knife underneath the driver's seat, within arm's reach of complainant. Using her left hand,

complainant reached for the knife and slowly removed it from its steel-lined case. She then feigned hugging the assailant, transferred the knife to her right hand, and held it to his back. Complainant told defendant to get off her and exit the car. Defendant did so and pulled on his pants. Complainant then exited the car. As she was attempting to retrieve her pants from the car, defendant struck her in the forehead with a brick. Complainant, with the knife in hand, then ran off pursued by defendant. She threw the knife under a fence surrounding a house and put her pants on. The complainant tapped on a window in an effort to attract attention inside the house. This failing, she ran home. Shortly thereafter, she telephoned the police.

Officer Mark Washburn testified he arrived at complainant's house at 4:15 a.m. on July 7. He observed complainant in a confused state, with a wound to the forehead. Washburn also noticed a strong odor of alcohol on Hawthorne's breath and that her eyes were glassy. Complainant told Washburn she had been sexually assaulted. She added that although she was able to get the knife away from her assailant during the attack, the assailant regained the knife and stabbed her in the head. Complainant then insisted they return to the scene and search for the knife. After an unsuccessful 30-minute search, Washburn accompanied complainant to a hospital for treatment.

Detective DeLawrence Garrett testified that on July 8, complainant, without reservation, identified defendant from a photographic lineup. Thereafter, Garrett obtained a warrant for defendant's arrest and proceeded to the defendant's girlfriend's residence in Rockford in order to execute the warrant. When he arrived at the residence, Garrett observed an automobile in front of the residence which he later identified as defendant's. After sitting outside the residence for 15 to 20 minutes, Garrett called for assistance, then exited his car and talked to Mrs. Clay. He then proceeded into the residence and found defendant in one of the bedrooms. Garrett brought defendant outside and arrested him. The defendant's automobile was towed to the police station and was later searched, without a warrant, by Garrett and Officer John Germano. A tube of lipstick, an eyebrow pencil and several combs were seized from the glove compartment of the car. On cross-examination, Garrett agreed defendant provided him with the names of persons who could account for his whereabouts at the time complainant was allegedly assaulted.

For the defense, emergency room nurse Leora Ames testified that in the early morning hours of July 7, she assisted a doctor at Rockford Memorial Hospital in administering to complainant tests contained in a standard sexual assault kit. Included were hair combings,

vaginal and oral swabs and slides, and blood samples. The blood test was taken at approximately 9 a.m. During her stay at the hospital, complainant told Ames she had been to a party with a girlfriend and had decided to go outside and get some fresh air. A gentleman friend was talking with her girlfriend when she left. The complainant went outside, and a man was standing there; he offered to light her cigarette, but his lighter did not work, so he suggested that she get in his car to use the lighter. She did, and he drove off. The man parked the car and told her to take her clothes off. She declined, and he then produced a knife, held it to her throat and proceeded to sexually assault her. While the sexual assault was in progress, the man put the knife under the front seat; the complainant picked up the knife and realized she could have stabbed him but did not. He then realized she had the knife, and he picked up a brick or "something" that was under the seat and hit complainant in the forehead. She then exited the car and retrieved her jeans, which the assailant had thrown out of the car. She then ran to a nearby house and pounded on the door. When no one answered, complainant ran home and telephoned the police. Nurse Ames further testified complainant stated she had been sexually assaulted both orally and vaginally.

Mrs. Emma Clay, the mother of defendant's girlfriend, Angela Clay, testified that on July 7, at approximately 2 a.m., she was in her kitchen preparing and cleaning ribs for Sunday dinner. Mrs. Clay stated that Angela and defendant arrived home at approximately 2:30 a.m. They were accompanied by Angela's sister, Barbara Clay. Angela and defendant went into the living room to watch television, and they were still there when Mrs. Clay went to bed at approximately 3 a.m. Robert Graham, Mrs. Clay's brother, testified he arrived at the Clay house on July 7, at approximately 1 a.m. At approximately 2:30 a.m., while watching television with his nephew in the basement, Graham heard the defendant enter the house accompanied by Angela and Barbara Clay. Defendant visited with Graham for 5 or 10 minutes in the basement and then went upstairs.

Angela Clay testified that, between 10:15 p.m. and 1 a.m. on the night in question, she and defendant were in and around defendant's car located in a parking lot across the street from the Tap. At approximately 1 a.m. they went to a liquor store, purchased a quart of beer and a small bottle of wine and returned to the same parking spot. As they sat in the car, Barbara Clay came out of the Tap and asked them for a ride. When the Tap closed, Angela and defendant took Barbara, Curtis Box and Debbie Buriss to Box's Barbecue restaurant. The group then dropped off Box and Buriss and went home. Angela Clay

was shown the lipstick and eyebrow pencil found in defendant's car and identified them as belonging to her.

Barbara Clay testified she arrived at the Tap about 11:30 p.m. on July 6 and stayed there until 2 a.m. the next day. Barbara did not recall seeing complainant inside the Tap. The remainder of Barbara's testimony was substantially similar to her sister Angela's. Roy Sams stated he observed defendant across from the Tap at approximately 1:30 a.m. on July 7, talking and drinking with several people.

Defendant testified that on the evening of July 6, he was riding in his car with his girlfriend, Angela Clay. They drove to the J & B Tap and parked in a parking lot across the street. They stayed there, drinking and talking, for approximately three hours. Upon leaving the Tap, defendant and Angela Clay went to Box's Barbecue restaurant with Curtis Box and Debbie Buriss. After leaving Box's Barbecue, defendant dropped off Box and Buriss and went to the Clay residence. When he arrived, he went downstairs to see Angela's brother and uncle, and then went upstairs to the living room. Defendant said he then fell asleep. Defendant stated the first time he saw the complainant was at his preliminary hearing. There was a stipulation made that defendant was convicted of felony theft in 1981.

A stipulation was also made to the test results of the sexual assault kit administered to complainant. There was no seminal material found, and nothing of an evidentiary value was found in the fingernail clippings. The stipulation further stated: "The lack of seminal material in the items tested indicates either no ejaculation during intercourse or no intercourse; that the blood sample was tested and found to contain .165 grams percentage ethyl alcohol and the legal presumption for intoxication is .10 grams percentage ethyl alcohol."

At the jury instruction conference, defense counsel objected to People's instruction No. 9, the statutory definition of sexual penetration, on the basis that the last sentence of the instruction, *i.e.*, "Evidence of the admission of semen is not required to prove sexual penetration," could mislead the jury because the instruction placed undue emphasis on a matter that could be taken either way. The court overruled the defendant's objection.

The jury found the defendant guilty of aggravated criminal sexual assault and aggravated battery. Defendant was sentenced to a 15-year term of imprisonment on the sexual assault conviction and a concurrent four-year term of imprisonment on the battery conviction.

Defendant first argues he was not proved guilty beyond a reasonable doubt. In support of his argument, defendant asserts the complainant's testimony was disjointed and inconsistent; there was scant

physical evidence introduced; the State failed to call a witness that could have corroborated the complainant's identification; and defendant's alibi was supported by five witnesses. Defendant points to the following inconsistencies between complainant's testimony at trial and, variously, her testimony at the preliminary hearing; her statement to police made shortly after the incident; and her statements to the nurse who treated her at the hospital.

At trial, complainant stated she and her friend, Marita Warren, went to a restaurant adjoining the J & B Tap and sat at a table. A short time later, defendant came over and talked to Warren. The complainant then got up and went outside. At the preliminary hearing, complainant stated she was walking around and mingling in the restaurant when she observed defendant sit at the table occupied by Warren. The complainant said she went and sat down at the table before telling Warren that she was going outside. Nurse Ames testified that complainant told her she had been to a party. The second inconsistency mentioned by defendant addresses the sequence of events that transpired outside the restaurant. At trial, complainant testified that defendant followed her outside, and complainant asked defendant for a light for a cigarette. Defendant stated he had a light in his car. The two proceeded to the car. Complainant sat in the passenger seat, and the defendant started the car and drove off. Nurse Ames testified that complainant told her she went outside and defendant was standing there; defendant's lighter did not work; they proceeded to the car; and defendant drove off.

The next inconsistency relied on by defendant concerns the appearance of the knife. At trial, complainant claimed defendant retrieved a knife from underneath the car seat shortly after driving off and held the knife to the complainant's throat during the remainder of the car ride. Complainant added that during the assault, defendant replaced the knife under the seat, and when she retrieved the knife it was in a case. Nurse Ames stated complainant told her defendant produced the knife only after the car was stopped and complainant refused to take her clothes off. Ames also testified that complainant did not mention a knife case. The fourth inconsistency cited by defendant concerns the head injury suffered by complainant. At trial, complainant stated she put the knife to defendant's back, forcing defendant off her and out of the car. Complainant then exited the car and reached back for her trousers. At that point, defendant hit her in the head with a brick. Officer Garrett testified that complainant stated defendant recovered the knife from complainant and stabbed her in the head. Nurse Ames stated that complainant said that while

she was inside the car, defendant hit her in the forehead with a brick. Complainant then exited the car, and defendant threw her trousers out of the car.

The next inconsistency resulted from complainant's testimony that she tapped on the window of the house she fled to to attract attention. Nurse Ames testified that complainant said she pounded on the door. The sixth inconsistency referred to by defendant concerns the occurrence of oral sexual assault. At trial, complainant stated she had not been sexually assaulted orally. Nurse Ames stated complainant told her she had been sexually assaulted orally. The final inconsistency relied on by defendant addresses complainant's description of defendant's automobile. Complainant testified the car had a hard top when, in fact, it had a vinyl top. In addition, complainant stated there was a pair of large dice attached to the rear view mirror. Defendant's girlfriend and the officers who searched the car said there were no dice in the car.

In response to defendant's contention that the above inconsistencies rendered the complainant's testimony unclear and unconvincing, the State, while either explicitly or implicitly acknowledging the inconsistencies, argues that the discrepancies are not sufficient to render complainant's testimony unclear and unconvincing. The State first contends the inconsistencies between complainant's trial testimony and the statements attributed to her by nurse Ames are attributable to the proximity between the attack and the complainant's statements to Ames, as well as the nature of the assault. Additionally, the State asserts that the following inconsistencies, whether minor or not, were collateral because they concern the manner in which the incident occurred and not whether defendant was the perpetrator: (1) whether complainant was mingling in the restaurant or sitting at the table when the defendant sat down and talked with Warren; (2) whether complainant tapped on the window or pounded on the door; (3) whether the car had a hard top or vinyl top; and (4) whether there were dice attached to the rear view mirror of the car. Finally, as to the appearance of the knife and the manner in which complainant sustained her head injury, the State argues that aside from any inconsistencies, the complainant's testimony that she was threatened with a knife, was able to gain control of the knife, and that defendant struck a blow to her head was clear and convincing.

■ In the successful prosecution of a sex crime, the testimony of the complaining witness must be clear and convincing or corroborated by some other facts or evidence. (*People v. Daniels* (1984), 129 Ill. App. 3d 894, 899, 473 N.E.2d 517.) Clear and convincing evidence,

however, is not synonymous with uncontradicted or unimpeached testimony. (*People v. Brown* (1984), 122 Ill. App. 3d 452, 455, 461 N.E.2d 71.) Consequently, minor inconsistencies in complainant's testimony or between complainant's testimony and that of other witnesses do not constitute grounds for reversal. Rather, such discrepancies affect credibility, which is a function to be judged by the trier of fact. (*People v. Lamacki* (1984), 121 Ill. App. 3d 403, 418, 459 N.E.2d 1142.) If the discrepancies do not detract from the reasonableness of the victim's story, the testimony may be found clear and convincing. *People v. Redman* (1986), 141 Ill. App. 3d 691, 703, 490 N.E.2d 958.

■■ In our opinion, the inconsistencies detailed above do not detract from the reasonableness of complainant's story. We agree with the State that the majority of the inconsistencies relied on by defendant are minor and collateral. Furthermore, the remaining inconsistencies, surrounding when the knife was produced by defendant and where and how the complainant was injured, involve collateral matters relating to how the incident occurred. They do not call into question the identity of the attacker or whether the complainant was in fact sexually assaulted and hit on the head with a deadly weapon. (*People v. Fleagle* (1984), 129 Ill. App. 3d 298, 302, 472 N.E.2d 155.) In this regard, the complainant's statements immediately after the incident and her testimony at trial were consistent. In sum, while the inconsistencies that developed at trial undoubtedly affected the credibility of the complainant, we do not believe they sufficiently detracted from the reasonableness of complainant's testimony to render her testimony unclear and unconvincing.

■■ Having found complainant's testimony was clear and convincing, we need only briefly address defendant's remaining contentions in support of his reasonable doubt argument. Initially, we note that complainant's prompt complaint provided sufficient corroborating evidence to sustain the conviction. (*People v. Redman* (1986), 141 Ill. App. 3d 691, 704, 490 N.E.2d 958.) Regarding defendant's claim that there was scant physical evidence introduced, we note the lack of physical evidence of a sexual assault is not fatal to the State's case and not required to prove the commission of a sex crime. (*People v. Morrow* (1982), 104 Ill. App. 3d 995, 1000, 433 N.E.2d 985.) As to the State's failure to call Marita Warren, the failure of the State to call an occurrence witness does not raise an inference that the absent testimony would have been unfavorable to the State where the testimony is of no special importance and the witness is also known and available to the defendant. (*People v. Thompson* (1981), 93 Ill. App. 3d 117, 121-22, 416 N.E.2d 1222.) Such was the case here. Finally, concerning

defendant's alibi, a jury is never required to accept alibi testimony over the positive identification of the accused even if the alibi is given by a greater number of witnesses. (*People v. Houston* (1986), 151 Ill. App. 3d 102, 110, 502 N.E.2d 1111.) "The jury is in a superior position to observe the witnesses and consider their interest in exonerating defendant." (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 711, 466 N.E.2d 640.) Therefore, defendant's alibi need not be believed regardless of the number of witnesses testifying on defendant's behalf.

■ A court of review will not disturb a conviction unless the evidence is so palpably contrary to a guilty determination, or so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt. (*People v. Brown* (1984), 122 Ill. App. 3d 452, 455, 461 N.E.2d 71.) In the present case, complainant positively identified defendant in a photographic lineup the day after the incident, and at trial. Complainant made a prompt complaint to the police and detailed the incident to the treating nurse. Complainant, who was 29 and the mother of an 11-year-old son, did not have any prior acquaintance with defendant. There is no indication she had any motive to falsely implicate defendant. Finally, while inconsistencies arose as to how the incident occurred, the evidence was consistent that defendant drove complainant to a secluded area, forced her to disrobe, sexually assaulted her, and hit her in the head, causing injury. The jury heard the testimony presented, assessed the credibility of the witnesses and reached a guilty verdict on both charges. For this court to reverse, we would have to make the opposite determination without the obvious benefits accorded a jury or conclude that complainant's testimony was palpably unreasonable. Based on our review of the record, we conclude that although the case is a close one, the defendant's conviction should not be disturbed.

Defendant next argues the lipstick and eyebrow pencil obtained by the police during a warrantless search of defendant's automobile should have been suppressed because the police could have obtained a warrant before searching the car and, alternatively, the exigent circumstances purportedly justifying the seizure of the car were unnecessarily created by the police. As primary support for his argument, defendant relies on *People v. Loggins* (1985), 134 Ill. App. 3d 684, 480 N.E.2d 1293. In *Loggins*, defendant was seated in a van in the parking lot of a grocery store when he ordered the victim to hand over her purse and place her groceries in the van. The victim was able to obtain the license number of the vehicle and notice a line of rust on the van. The next day a citizen informant provided police with a description of the car and its location. An arrest warrant was issued

based on the victim's photographic identification of the defendant and further information from the citizen informant. The police proceeded to the address provided and arrested defendant. In addition, defendant's car was seized and brought to the police station. The State based its claim of exigent circumstances on the probability that proceeds of the crime might still have been present in the car and that the female who shared the defendant's apartment could easily have "spirited" the vehicle and its contents from the scene. The court rejected the State's argument, relying on *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022. In *Coolidge*, the supreme court held there were no exigent circumstances to seize defendant's automobile where defendant was a suspect for several weeks, the police knew defendant's car was at his home and they planned to seize it when they arrested him. In such circumstances, the court determined the warrant requirement would not be dispensed with. (*People v. Loggins* (1985), 134 Ill. App. 3d 684, 689, 480 N.E.2d 1293.) The applicability of the *Coolidge* rationale to the facts in *Loggins* is readily apparent, as is the inapplicability of the *Coolidge* rationale to the case at bar. In *Loggins*, as in *Coolidge*, the police had probable cause to obtain a search warrant when they obtained the arrest warrant; here, they did not.

The evidence presented at the suppression hearing revealed that on the morning of July 8, the day after the alleged assault, the complainant identified defendant in a photographic lineup conducted by Detective Garrett, who then obtained a warrant for defendant's arrest. Based on information he had obtained from fellow police officers, Garrett proceeded to the home of defendant's girlfriend, Angela Clay, in order to execute the arrest warrant. Upon arrival at the Clay home, Garrett observed a number of males coming in and out of the residence and proceeding to and from a vehicle parked on the street. The vehicle resembled the description provided to Garrett by complainant, who had told Garrett she was sexually assaulted in a car and had left her purse in the car when she fled. Garrett checked the license plate through communications and was advised the car was registered to defendant. After identifying the car as defendant's, Garrett spoke with Angela's mother outside the residence. Garrett advised Mrs. Clay he needed to talk to defendant. Garrett then proceeded into the home, located defendant, and told defendant he wished to talk to him outside. Once outside, Garrett advised defendant he was under arrest. Defendant stated that he wanted to give the keys to the vehicle to a woman who was in the area. Whether he was able to do so is not indicated in the record. Meanwhile, a group of approximately 15

or 16 individuals and 12 police officers had gathered at the scene. Defendant claimed the onlookers were orderly and quiet. Garrett stated that he feared for his safety and the safety of his fellow officers. Before leaving with defendant, Garrett arranged to have defendant's car towed to the police station, where it was later searched by Garrett and Officer Germano. Both officers testified that before they searched the car the doors were unlocked, the windows were open and the glove compartment was open. A tube of lipstick, an eyebrow pencil and several combs were recovered from the glove compartment. No search warrant was obtained.

In support of his argument that the lipstick and eyebrow pencil should have been suppressed, defendant first contends that Garrett could have obtained a search warrant at the same time he obtained the arrest warrant because the grounds for searching the car were fully developed before Garrett arrived on the scene. The deficiency in this argument lies in the fact that while Garrett may have had grounds to search the car used during the assault, he had no information regarding ownership of the car, the location of the car or the make and model of the car. Consequently, there was no basis to issue the search warrant for defendant's car prior to Garrett's arrival on the scene. See *People v. Peter* (1973), 55 Ill. 2d 443, 455, 303 N.E.2d 398.

Defendant next asserts that once Garrett was advised the vehicle he observed was registered to defendant, he could have obtained a warrant while fellow officers guarded the car. While Garrett could theoretically have proceeded in this fashion, even if he had the consequences would have been the same. As stated in *People v. Peter* (1973), 55 Ill. 2d 443, 456, 303 N.E.2d 398:

"Some may contend that the officers could have left a detail to immobilize the vehicle and deny its use to anyone until a warrant could be secured. Such conduct would itself constitute a warrantless seizure of the vehicle. In that event there is little to choose in terms of practical consequences between an immediate seizure and search without a warrant and the car's immobilization until a warrant is obtained. *Chambers v. Maroney* [(1970)], 399 U.S. 42, 52, 26 L. Ed. 2d 419, 429, 90 S. Ct. 1975."

Defendant's contention in this regard therefore does not warrant suppressing the evidence obtained from the automobile.

Finally, defendant contends there were no exigent circumstances, other than those created by police, justifying the seizure and search of the car. We disagree. When Garrett proceeded to the Clay

residence with the arrest warrant for defendant, he was aware the alleged attack had occurred in an automobile and that the complainant had left her purse inside the vehicle. As noted above, however, probable cause to search the vehicle parked outside the Clay residence did not arise until after Garrett arrived with the arrest warrant and ascertained that the vehicle, which matched the description provided by complainant, belonged to defendant. When Garrett arrived, several individuals were walking back and forth from the car to the house. When Garrett exited the house with defendant a crowd of onlookers had gathered. Defendant attempted to give the car keys to a female bystander. Garrett testified he feared for his safety and the safety of his fellow officers. These circumstances were sufficient in our opinion to justify police seizure of the automobile on grounds of exigent circumstances.

■■ A trial court's ruling on a motion to suppress will not be disturbed on review unless it is found to be clearly erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96, 99, 440 N.E.2d 869.) Based on our review of the record in this case, we conclude the trial court correctly denied defendant's motion to suppress.

■■ Defendant next argues the court erred in denying his request to delete the final sentence of the jury instruction setting out the definition of sexual penetration, which is an element of aggravated criminal sexual assault. Section 12—12(f) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f)) defines sexual penetration as follows:

> " 'Sexual penetration' means any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. *Evidence of emission of semen is not required to prove sexual penetration.*" (Emphasis added.)

The instruction submitted by the State defining sexual penetration was a draft of a proposed pattern jury instruction. Defendant claims the sentence referring to the emission of semen singled out and unduly emphasized one facet of the evidence.

At trial, complainant testified she was unsure whether defendant ejaculated. During defendant's case in chief, the parties stipulated that a sexual assault kit identified as from complainant was tested for seminal material, and none was found. The parties further stipulated that the lack of seminal material in the items tested indicated either

no ejaculation occurred during intercourse or there was no intercourse.

Defendant contends the final sentence of the jury instruction defining sexual penetration calls undue attention to the portion of the stipulation stating that the lack of seminal material indicated no ejaculation during intercourse while ignoring the alternative clause that the lack of seminal material indicated no intercourse. Defendant argues the instruction implied to the jury that the court accepted the prosecution's position that sexual intercourse had occurred without ejaculation, thereby shaping the nature of the jury deliberations.

In support of his argument, defendant relies on a line of cases holding that instructions calling particular attention to a certain portion of the evidence are improper. We agree with the State that these cases are distinguishable. In *People v. Godbout* (1976), 42 Ill. App. 3d 1001, 1008-09, 356 N.E.2d 865, the trial court was found to have erred in giving the jury numerous instructions regarding the effect of a breathalyzer test. In both *People v. Gaither* (1968), 103 Ill. App. 2d 47, 55-56, 243 N.E.2d 388, and *People v. Sledge* (1966), 71 Ill. App. 2d 285, 290-92, 218 N.E.2d 845, the trial courts' refusal to give instructions advising the jury to view carefully the alleged verbal admissions of the defendant were upheld. In each of these cases it is readily apparent the instructions in issue placed undue emphasis on one aspect of the case.

Here, on the other hand, the portion of the instruction challenged by defendant is part of the legal definition of sexual penetration—an element of the offense of aggravated criminal sexual assault for which defendant was tried. Consequently, in refusing defendant's request to strike the last sentence of the instruction, the trial court was fulfilling its duty of fully and fairly instructing the jury on the applicable law (*People v. Prather* (1985), 138 Ill. App. 3d 32, 42, 485 N.E.2d 430; *People v. Peebles* (1984), 125 Ill. App. 3d 213, 217, 465 N.E.2d 539), rather than emphasizing one factor of the case. Defendant has not provided and our research has not disclosed any case in which a jury instruction comprising the pertinent portions of the statutory definition of an element of an offense was deemed improper because the instruction unduly emphasized one portion of the evidence. We see no reason to adopt such a rule in this case.

Defendant lastly contends that sections 12—12 through 12—18 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 12—12 through 12—18) are so unreasonable in their definitions and applications as to violate the due process clauses of the United States and Illinois constitutions. Defendant acknowledges he did not raise

this challenge in the trial court. Nevertheless, he requests we reach the merits of his argument as a matter of plain and substantial error. We decline to do so and find this argument waived.

■■■ While defendant correctly notes that a reviewing court may decline to apply the waiver rule where a substantial question of constitutionality is raised which, if sustained, would render void the statute under which the accused was charged and convicted (*People v. McNeal* (1983), 120 Ill. App. 3d 625, 627, 458 N.E.2d 630), it has also been held where the same arguments have been raised in other cases and rejected, they no longer present substantial questions of constitutionality and will be deemed waived. (*People v. Otis* (1985), 135 Ill. App. 3d 718, 722, 479 N.E.2d 40.) The latter rule is applicable here. The majority of the contentions raised by defendant have been addressed and rejected by the appellate court. (*People v. Bartay* (1986), 150 Ill. App. 3d 130, 131-32, 501 N.E.2d 364; *People v. Burmeister* (1986), 147 Ill. App. 3d 218, 221-24, 497 N.E.2d 1212.) The remaining contention arguing that the definition of "[f]orce or threat of force" (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(d)) is unconstitutionally overly broad and vague was recently rejected by our supreme court in *People v. Haywood* (1987), 118 Ill. 2d 263.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

LINDBERG and HOPF, JJ., concur.