THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HAROLD ANDERSON, JR., Defendant-Appellant.

(Nos. 58288, 58831 cons.;

First District (3rd Division)—June 20, 1974.

James J. Doherty, Public Defender, of Chicago (Ian Levin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Jerald A. Kessler, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a bench trial, defendant, Harold Anderson, Jr., was found guilty of the offenses of rape, deviate sexual assault, and robbery. (Ill. Rev. Stat. 1969, ch. 38, pars. 11—1(a), 11—3, 18—1.) He was sentenced to the State penitentiary for each offense for a term of 5 to 12 years, to run concurrently. Defendant appeals. He contends that he was not proved guilty beyond a reasonable doubt of the offenses of rape, deviate sexual assault, and robbery. The State concedes the interdependence of the evidence to support all three charges. The facts follow.

Complainant was 18 years of age at the time of the incidents herein and testified at trial to the following. At approximately 5 P.M., on October 3, 1970, she was walking alone in a southerly direction on the east side of Wells Street in the Old Town area of Chicago, where she had come with the intention of buying a purse. It was daylight, and she had passed many pedestrians. She noticed that there was heavy automobile traffic moving in both directions along Wells Street. Near the intersection of Wells and Goethe Streets a young black man—later identified by her as the defendant—approached her from the rear. He put his right arm

around her right shoulder, placed his left hand to her left side, and said, "Do as I say or I'm going to shoot. I have a gun." She stated that she felt something hard against her left side. She tried to scream and defendant put his hand over her mouth, choking her, and forced her diagonally into the intersection, toward the southwest corner. At one point, while crossing the intersection, defendant tried to push her in front of a car, and near the center of Wells Street she tried unsuccessfully to squat down to attract attention. Defendant forced her onto the curb but she struggled back down into the street. He pulled her up onto the curb again and she grabbed a sign pole. Defendant pulled her loose and forced her toward the west entrance of the corner apartment building. When they reached the entrance he began conversing amicably with another black man standing outside the doorway. She did not understand their conversation and she said nothing. While they talked she held onto the entrance doorframe.

The defendant then pushed her through the doorway and she grabbed the stair banister. She pleaded with the defendant and asked him why he was doing this to her. He said he only wanted to talk with her but wanted to talk upstairs. He began forcing her up toward the second floor and she attempted to cry out, but he struck her on the face and head and choked her. On the second floor he took her into a washroom and removed her coat and laid it on the floor. They heard voices in the hall and defendant placed his hand over her mouth and said, "Be quiet. Don't make a sound." She put her coat on and they left the washroom. Again, in the hallway, she attempted to run down the stairs, but defendant caught her and hit her in the face, then forced her up the stairs and into a washroom on the third floor.

Complainant further testified that in the washroom, defendant removed her coat and laid it on the floor, then pulled her pants down. After forcing her to lie down on her coat, defendant removed his pants and underwear and pulled her underwear half off. He removed a sanitary napkin she was wearing, threw it into the toilet, then penetrated her vagina with his penis. He could achieve only partial penetration and she told him she was a virgin. Defendant told her to sit on him on the toilet for the next few minutes. Then he demanded money and took $6 from her purse. Afterwards they both dressed, and defendant, holding her hands behind her back, forced her down the hallway to still another washroom on the third floor. On the way, they passed a black man and complainant grimaced and made a low groan, but did not cry out to him.

Inside the third washroom, defendant again removed her coat, undressed her, and forced her to lie down on her coat. He then undressed

and forced her to perform an act of fellatio. Subsequently, defendant engaged in two more acts of intercourse with complainant. After the second of these acts she reached down and touched her vaginal area and discovered that she was bleeding; she then wiped her hand clean on the bathtub in the third washroom. After they had dressed, defendant took complainant's watch and ordered her to stay in the washroom until he returned. She did not try to leave, but remained there for five or ten minutes until defendant returned. While alone in the washroom she heard voices in the hallway. Defendant returned with another black man and requested that she give him a "hand job." She refused, and the three of them left the washroom. In the hallway defendant grabbed complainant, kissed her, and said, "Goodbye, nice knowing you." She then ran down the stairs and out on Wells Street, where she saw two policemen standing within sight of the building she had left. She informed them of what had happened and was taken to Henrotin Hospital where she was given a medical examination. Thereafter, she gave the police a detailed description of defendant and of his clothing.

Complainant did not tell her parents she had been raped until the next day after the police had requested that she go to the station to view a lineup. In the lineup she identified defendant as the person who had attacked her.

On cross-examination complainant further testified. She had been in the Old Town area only once before, some 4 years prior to the occurrence in question. There were no other pedestrians within the block where she was first accosted by defendant. She did not yell for help during the struggle across the intersection because she was afraid of defendant's gun. However, she admitted that she never saw a gun during the entire incident; that she could not tell the difference between a gun and a finger being pushed into her side; and that during the crossing and afterwards she saw the defendant no longer had anything in his hands. Complainant also admitted asking defendant whether he was from Texas, and if he was a Baptist. She told him she had a friend who knew a lot about blacks and that as a result she also knew something about them. She characterized this conversation as an attempt to get his mind off whatever he was planning. When asked why she made no outcry for help from the man at the apartment building entrance or the man they passed in the third-floor hallway, complainant said that both of the men were black, both seemed to know the defendant, and she believed that neither of them would help her. She stated she had been a virgin prior to the occurrence and that although she was wearing a sanitary napkin she was not then having her menstrual period. She also admitted that she suggested anal intercourse when defendant could not achieve full penetration in the

second washroom; that she just wanted to get it done with and get out of there.

James Leyden, a patrolman of the Chicago Police Department, testified that he arrived at Henrotin Hospital on October 3, 1970, in response to a police radio report that a rape victim had been brought there. He interviewed the complainant and took down a detailed description of her assailant. He stated that her clothing was a little dirty, her face was red, and she had a bruise under one eye and a scratch on her neck. Leyden and his partner accompanied complainant back to the building where the alleged attacks occurred. They inspected the three washrooms which complainant said she and her assailant had occupied. Leyden made no mention of finding a sanitary napkin in the toilet in the second washroom, nor of observing any blood on the bathtub in the third washroom. He stated that he could not recall whether any inquiries were made of residents of the building to determine what they might have seen or heard. He further stated that he arrested defendant later that same evening in Old Town, and that defendant and his clothing fit the complainant's description perfectly. He stated that while checking defendant's clothing he noticed a reddish stain on the fly of his undershorts.

Judy Murakami, a licensed practical nurse, testified that she was assigned to the emergency room of Henrotin Hospital on October 3, 1970. She stated that a report indicated that complainant had said her last previous menstrual period was in the beginning of September 1970. The report also indicated that complainant had scratch marks on the left side of her neck.

Dr. William Whiteside testified that he was the physician who conducted the emergency-room examination of complainant at Henrotin Hospital; that the report indicated that abrasions and contusions were found on complainant's left cheek and forehead, and an abrasion was found on the left side of her neck. No evidence of trauma or injury to the vaginal area was found. Vaginal bleeding was evident, but since there was an absence of vaginal injury, he stated this would lead to the assumption that the bleeding was the result of normal menstruation or some other form of internal discharge. He further testified that he could not give an opinion as to whether complainant had been forcibly raped, but that at the time of her examination she was not in shock and her general condition was listed in the report as good.

A portion of defendant's undershorts and the pap smears taken at the time of complainant's emergency room examination were introduced into evidence. All were positive for the presence of spermatozoa.

Testifying in his own behalf, defendant stated that he first met complainant in the Old Town area in the summer of 1970. On October 3,

1970, he was on Wells Street and heard complainant call out to him by his nickname, "Hound Tooth." He crossed the street to where she was standing and she asked if he knew where she could get some marijuana, and he said he did not. He described the complainant as a "hippie" and said she appeared to be "high." He went with her to a snack shop where she bought his supper, and they visited a suede store on Wells Street between Scott and Goethe Streets. At the corner of Wells and Goethe Streets, complainant told him she knew some hippie friends who used to live in the corner building. She said she wanted to have sexual intercourse with him before she came off her "high" and asked if he knew where they could go. When he said he did not, she said there were lots of empty apartments in the building where her friends had lived, and they agreed to go there. Defendant stated that at the time it was daylight and there were numerous pedestrians and automobiles moving along Wells Street.

He testified that they entered a washroom next to an apartment where she said her friends had lived. She took off her coat and suggested that they lie on it because it was vinyl and dirt could easily be removed from it. They heard voices outside and complainant told defendant they should go somewhere more private, and they went to another washroom on the third floor. There complainant again took off her coat and laid it on the floor. At her request defendant unzipped her pants because the zipper was in the back. He then lay beside her, wearing his undershorts. He saw that she was wearing a sanitary napkin, and when he removed it he discovered that she was having her period. Because of this he declined her suggestion that they engage in intercourse. She then suggested anal intercourse, but he again declined and asked her to perform fellatio. She said although she had not had much experience at that, she would try it. Defendant testified that during this act the complainant began to bite his erect penis and when she ignored his pleas to stop, he pushed her head back with his right hand on which he was wearing a ring. Complainant appeared shocked and began to blush. They dressed and left the washroom. In the hallway they passed another black man. When they reached the building entrance complainant asked if he was going to find her some marijuana. He said he did not have enough money and she gave him $5. They were then joined by another black man and defendant told her to leave, but she said she would wait. He told her he would return to the building in 10 minutes with the marijuana, but he never returned. He was arrested in the Old Town area later that evening while wearing the same clothes he had worn when he was with complainant.

Defendant stated that while he was with her they had talked about various subjects; she asked if he was from Texas, whether he was a Baptist or a Catholic; and they discussed the fact that she had attended Catholic schools. Defendant denied performing any sexual acts against complainant's will and denied using any force during the entire incident except to terminate the oral copulation. He also denied robbing complainant.

██ Defendant's contention that he was not proved guilty of rape beyond a reasonable doubt is predicated on his assertion that the testimony of complainant is implausible and that all of the evidence presented by the State is insufficient to prove that any of the alleged acts of intercourse were performed by force and against the will of complainant. It is fundamental that in order to prove the charge of forcible rape there must be sufficient evidence to demonstrate that the act was committed by force and against the will of the female. (*People v. Taylor* (1971), 48 Ill.2d 91, 268 N.E.2d 865; *People v. DeFrates* (1965), 33 Ill.2d 190, 210 N.E.2d 467.) In *Taylor*, at page 98, the court mentioned this requirement and its application:

"[T]he degree of force exerted by the defendant and the amount of resistance on the part of the complaining witness are matters that depend upon the facts of the particular case; that resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female as where the assailant is armed with a deady weapon, and that proof of physical force is unnecessary if the prosecuting witness was paralyzed by fear or overcome by superior strength of her attacker; that it is, however, fundamental that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will."

██ Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases. Moreover, in such cases it is the duty of a reviewing court not only to carefully review the evidence, but to reverse the judgment if that evidence does not remove all reasonable doubt and create an abiding conviction that the defendant is guilty of the crime alleged. (*People v. Faulisi* (1962), 25 Ill.2d 457, 185 N.E.2d 211; *People v. Barfield* (1969), 113 Ill.App.2d 390, 251 N.E.2d 923.) The ultimate issue presented in the instant case is not that of credibility, but whether the evidence introduced by the State, even if

believed, is sufficient to create an abiding conviction that the defendant is guilty of intercourse with the complainant by force and against her will.

■■ The uncorroborated testimony of a complaining witness is sufficient in itself to sustain a conviction for rape if that testimony is clear and convincing. (*People v. Brown* (1963), 29 Ill.2d 375, 194 N.E.2d 326; *People v. Mack* (1962), 25 Ill.2d 416, 185 N.E.2d 154.) If clear and convincing testimony is deemed to be lacking, corroboration is necessary to sustain a conviction. *People v. Kepler* (1966), 76 Ill.App.2d 135, 221 N.E.2d 801.

We find the testimony of the complainant in the instant case somewhat less than clear and convincing. Similar testimony was held to be insufficient in *People v. Taylor, supra.* There, the complaining witness had testified that the defendant had managed in the midst of a crowded parking lot to coerce her into entering his car by threatening her with being shot if she did not come with him. Without actually seeing a gun and without making an outcry for help she entered his automobile and they drove off. She further testified that while driving they discussed various topics and that defendant stopped at several stop signs. During this time she made no outcry for assistance and made no attempt to escape. After allegedly forcing her to engage in acts of intercourse and fellatio, the defendant dropped her off in an alley. She admittedly kissed him goodbye, and promptly reported that she had been raped. In reversing the judgment of guilty on the charge of rape the court stated that the evidence did not create an abiding conviction that the act of intercourse complained of was performed by force and against the will of the complaining witness.

In the case before us, complainant testified that after she was first accosted by defendant he forced her across the intersection of Wells and Goethe Streets while holding his hand over her mouth to keep her from crying out. On cross-examination she testified that she made no outcry at that time because she was afraid of his gun, and not because he held his hand over her mouth. It is doubtful that an attacker could brazenly accost a victim in broad daylight, then successfully spirit that victim across an admittedly busy street in a forcible manner without attracting the attention or intervention of anyone. It is also incongruous that complainant would refrain from making an outcry because of fear of defendant's gun, but would not refrain from engaging in a veritable wrestling match such as she described as occurring between herself and defendant before they entered the apartment building. Further, she stated that during the time she was being forced across the intersection she saw that defendant no longer had anything in his hands but, inex-

plicably, she still did not cry out for assistance. Complainant also admitted entering into a conversation with defendant concerning his background and her knowledge of black people.

■■■ Complainant testified that she did not inform either the man at the entrance of the building or the man they passed in the third-floor hallway that she was being held against her will. Her stated justification for not doing so was that both men were black and appeared to know the defendant, and she therefore did not believe they would help her. However, she testified that she did not understand the conversation between defendant and the man at the entrance, and there is no evidence of record that the man she and defendant passed in the third-floor hallway was known to defendant. In each case, complainant had sufficient control over her faculties and physical powers to request assistance from those individuals, yet did not do so. Justification for failing to make an outcry to a potential intervenor because that person was of the same race as the attacker was rejected in *People v. Qualls* (1961), 21 Ill.2d 252, 171 N.E.2d 612. Complainant also testified that after defendant left her alone in the third-floor washroom for 5 or 10 minutes she neither attempted to escape nor made an outcry for help. The failure to exercise an opportunity to escape or summon assistance was a significant factor in the reversal of judgments of guilty in both *Taylor* and *Qualls, supra.*

It was asserted by complainant that at the time of the incident she was a virgin and that she was not then having her menstrual period although she was wearing a sanitary napkin. She also stated that defendant could not at first achieve full penetration into her vagina but that subsequently he did succeed. However, Dr. Whiteside, the physician who made the emergency examination of complainant, testified that his report indicated an absence of vaginal trauma or injury and that the bleeding which was observed was probably attributable to normal menstruation or some other form of internal discharge. Finally, it was admitted by complainant that on her own initiative she suggested to defendant that they engage in anal intercourse.

■■ The major inconsistencies which arise from complainant's testimony concerning the force used by defendant and the manifestations of her own lack of consent to the alleged acts of intercourse require that adequate corroboration appear of record. We do not find in the record sufficient independent evidence in corroboration to afford a basis for sustaining the judgment of guilty on the charge of rape. The spermatozoa found on defendant's undershorts and that contained in pap smears taken from complainant at her emergency room examination are indicative only of recent intercourse and not rape. (*People v. Kepler, supra.*) Although the presence of sperm is a circumstance which can be considered

in corroboration of a complaining witness' testimony, it is not conclusive in itself that the act was performed by force and against the will of the female. *People v. Nemke* (1970), 46 Ill.2d 49, 263 N.E.2d 97; *People v. Reese* (1973), 14 Ill.App.3d 1049; 303 N.E.2d 814.

■■ There is independent evidence that at the time of the examination complainant had superficial marks on her face and neck. In another case, the presence of such marks along with the spermatozoa found on defendant's undershorts and in complainant's pap smears might suffice as corroboration. In the instant case, the presence of these marks does not constitute persuasive corroboration, in view of another factor established at that same emergency room examination. Despite her assertion that she had been a virgin and that defendant had experienced difficulty in achieving full penetration into her vagina, the report completed by Dr. Whiteside indicates an absence of vaginal trauma or injury. The State cites *People v. Dunigan* (1974), 17 Ill.App.3d 498, 308 N.E.2d 338 (abstract opinion), as a case where a rape conviction was sustained even though there was no evidence of vaginal injury. The *Dunigan* case is distinguishable. There, the complaining witness was a married woman with five children. In the case before us, the complainant's testimony was that she was a virgin at the time and that difficulty was had in achieving full penetration.

While complainant did appear at Henrotin Hospital soon after the occurrence, the two policemen to whom she first made complaint, according to her testimony, were not identified and did not testify. Officer Leyden testified that he met complainant after her emergency examination and that he and his partner returned to the apartment building with her and inspected each of the three washrooms she said she and defendant had used. His testimony is devoid of any reference to finding complainant's sanitary napkin in the second washroom where defendant had allegedly thrown it into the toilet bowl, or to observing any blood on the bathtub in the third washroom where complainant said she had wiped her bloodied hand clean. Moreover, Leyden could not recall whether any inquiries were made of the building residents to determine what they might have seen or heard in connection with an alleged rape having occurred therein. Complainant did not inform her parents that she had been raped until the following day when requested by the police to view a lineup.

■■ After the careful scrutiny of the State's evidence which is required of a reviewing court, we hold that evidence insufficient to remove all reasonable doubt and to create an abiding conviction that the alleged acts of intercourse engaged in by complainant and defendant were performed by force and against her will. The judgment of the trial court

as it relates to the finding of guilty on the charge of rape must therefore be reversed.

■■ Defendant was also convicted herein of the offense of deviate assault which is defined:

"(a) Any person of the age of 14 years and upwards who, by force or threat of force, compels any other person to perform or submit to any act of deviate sexual conduct commits deviate sexual assault." (Ill. Rev. Stat. 1969, ch. 38, par. 11—3(a).)

The elements of this offense are the same as those of rape except that penetration is required for rape. Force and lack of consent, as in rape, are likewise the gist of this offense. Therefore, we likewise conclude that defendant was not proved guilty of a sexual deviate assault beyond a reasonable doubt, and reverse the conviction. See *People v. Bruno* (1969), 110 Ill.App.2d 219, 231, 249 N.E.2d 252.

■■ Defendant was also convicted of the offense of robbery. The State in its brief filed herein admits that whether or not the property of complainant was taken by force, or the imminent use of force, is dependent upon the same evidence that would establish that the acts of intercourse and deviate sexual conduct were committed by force. In view of our reversal of the other convictions, we conclude that defendant was not proved guilty of robbery, and accordingly reverse.

For the reasons stated in this opinion, the conviction of rape, deviate sexual assault, and robbery, and the judgments of the circuit court of Cook County therein are reversed.

Reversed.

McNAMARA, P. J., and McGLOON, J., concur.