THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALPHONSE JACKSON, Defendant-Appellant.

First District (5th Division)   No. 86—2221

Opinion filed January 13, 1989.

MURRAY, P.J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Judy L.

Groeneveld, and Thomas V. Lyons II, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a jury trial the defendant, Alphonse Jackson, was found guilty of aggravated criminal sexual assault (rape), aggravated kidnapping and unlawful restraint. (Ill. Rev. Stat. 1985, ch. 38, pars. 10—2, 10—3, 12—14.) He was sentenced to concurrent imprisonment terms of 12 years for aggravated criminal sexual assault, six years for aggravated kidnapping and two years for unlawful restraint. The defendant appeals and contends for reversal that there was no rape, that the complaining witness agreed to have sexual intercourse with him for money, and, after the act, she was dissatisfied with the amount of money previously agreed upon and which the defendant tendered to her, and that the evidence failed to prove his guilt beyond a reasonable doubt. We review the evidence in detail.

The complaining witness testified that on August 18, 1985, at about 12 or 12:30 a.m. she left her young children alone in her apartment at 1420 E. Marquette Road in Chicago, Illinois, to make a telephone call at a public pay phone located on the street at 67th and Dorchester, two blocks from her home. Elliott further testified, however, that upon arriving at the pay phone, she *"just forgot to call,"* *"it was too late"* and she *"didn't want to disturb"* the person that she said she had just left her house to call. (Emphasis added.) She testified:

> "Q. As you were on 67th Street, *did you ever get to the phone?*
>
> A. *Yes; but I didn't make the call.*
>
> Q. What happened, at that time?
>
> A. Well, *I just forgot to call;* I didn't make it. *And I turned around to go back home.*
>
> Q. Who were you going to call?
>
> A. A friend of mine.
>
> Q. *Why didn't you call him?*
>
> A. Because *I figured it was too late, I didn't want to disturb anyone at his home."* (Emphasis added.)

The defendant argues that this testimony by Elliott is ludicrous; that her story that she would leave her home at midnight to make a phone call in a public street and upon arriving at the phone then "just for[get] to call," and that, after just leaving her home at midnight to make the call, and after forgetting to make the call, to suddenly decide, "I figured it was too late, I didn't want to disturb anyone at his

home" and "I turned around to go back home," are outrageous contradictions and so inconsistent as to be unworthy of intelligent consideration.

The defendant further contends that Elliott was not on the street to make a telephone call, but rather, Elliott was on the street streetwalking—plying her trade as a prostitute.

Elliott's explanation for being on the street at midnight—to make a telephone call—is reasonable and acceptable. Her foregoing explanations under the circumstances related by her for not making the telephone call, however, are questionable, to say the least.

After testifying that she did not make the telephone call that she left home at midnight and went to the phone to make and that she left the pay phone to return home, Elliott then testified:

"A. As I crossed the street a car pulled up behind me.

Q. Do you remember what kind of car, Idellar?

A. It was a small brown, two-door car, that is all I remember.

Q. When the car pulled up, what did you notice?

A. It was two guys in the car, and one of the guys got out between the streets and he went—the passengers on the passenger side—he got out of the car and walked about maybe two or three houses down from 66th Place, which is the next street in between Marquette and 67th Street.

Q. After the passenger got out of the car and walked away, what did you do?

A. I walked—I kept walking the way I was going and the car drove up behind me and *the driver was tooting the horn, beckoning for me*—you know, *to come to the car*; and I continued walking." (Emphasis added.)

Elliott then testified that, suddenly, the man who had gotten out of the car ran up behind her, grabbed her neck, put a gun to her side, threatened to shoot her if she screamed and forced her into the backseat of defendant's car.

Conversely, the defendant testified that there was no other man or gunman involved; that there was no gun; that he was driving his car on 67th Street en route to his home at 318 W. 51st Street when he saw Elliott on 67th Street. She motioned for him to pull over and come to her, and when he did, the following took place.

"I pulled over like around the corner—not really around the corner, right on the corner, and then she came over to the car. *She said, 'Are you dating?' I said, 'It all depends on how much.' She said, '20 dollars.' So she said, 'Well, we can pull*

*around to the vacant lot.' I said, 'I'm not going in no vacant lot.' Then she said, 'Well, where do you want to go?' I said, 'I want to go to the motel.' So we went to the motel."* (Emphasis added.)

On the other hand, Elliott contended that she was then taken in the defendant's car, by force with the gunman holding the gun at her side, from 67th and Dorchester, where she was accosted, not to an isolated or secluded area, but rather, to of all places the Dunes Motel, at least 30 blocks away, at 94th and Stony Island Avenue, a heavily traveled area, in Chicago, Illinois.

Again, we note the defendant's contrary version of the incident. The defendant testified that Elliott agreed to have sex with him in return for money. The defendant further testified that he picked Elliott up in his own car and the evidence was uncontradicted that there was a hole in the floor of the backseat which made it almost impossible for anyone to sit in the backseat of his car. The defendant's testimony that his car was registered in the defendant's name, Alphonse Jackson, at the defendant's resident address, 318 W. 51st Street, was also uncontradicted. In fact, the defendant's aforesaid testimony regarding the rear floor of his car was corroborated by defendant's exhibit No. 1, a picture of his car which depicted the hole in the floor of the backseat. Thus, the defendant testified and argues that Elliott and this man could not have been in the backseat of his car.

The defendant further testified and argues before us that the gunman was nothing but a phantom, who became a necessary belated participant in Elliott's fabricated version in an attempt by Elliott to give credibility to her concocted and false claim of rape.

According to Elliott, when the three of them, *i.e.,* the gunman, she and the defendant, arrived at the Dunes Motel, the defendant got out of the car and went to the motel office to register and pay for a room at the motel. Elliott stated that the defendant returned shortly thereafter without renting a room and said that the office was crowded.

Elliott testified that, after being unable to rent a room, the defendant then got back in the car and the defendant, Elliott, and the gunman aimlessly drove around different areas of the city. Elliott contended that while they were driving around the city the gunman threatened her and told her "to keep my head straight, not to look out of the window. *** [I]f I would try anything that he would hurt me." Elliott further asserted that the gunman also frisked her and took her house keys from her. Elliott related that the defendant and the gunman returned with her to the Dunes Motel.

According to Elliott, the defendant, after registering in the motel office for and obtaining the room, then went into the motel room while the gunman remained in the car with the gun pointed at her. Elliott stated that after checking the room, the defendant came out of the room and beckoned for the gunman to bring Elliott into the motel room. Elliott testified that the gunman told her to walk into the room and act as if they were boyfriend and girlfriend and that she did so.

It is difficult to conceive, as Elliott testified, that when they first went to the Dunes Motel, the motel was too crowded and they would thereafter drive aimlessly around and later return to the same crowded motel. It is also farfetched that two potential rapists would return with the victim at gunpoint to a motel which they know is crowded to commit a rape. They would not know that Elliott would not scream or cry out, or that her cries would not be heard, prompting assistance to her and her ultimate release. It is also inconceivable that a rapist would take his victim at gunpoint to a motel and pay for a room within which to rape his victim.

We note the defendant's reasonable, probable and contrary version. The defendant testified that he and Elliott went to the Dunes Motel to have sex, that he refused to demean himself by accepting her offer to perform the act in a vacant lot, that no one went with them to the Dunes Motel, that no force or gun was used, and that Elliott went into the office with him while he registered for and rented the room. The defendant's testimony was also uncontradicted that he went into the motel office, registered in his correct name, Alphonse Jackson, with his correct address, 318 W. 51st Street, Chicago, Illinois, and with his correct driver's license number, J254000063148, an accurate description of his auto, two-door brown Cougar, and rented a room at the motel. More importantly, this testimony of the defendant was also corroborated by the Dunes Motel room registration records.

Once inside the motel, according to Elliott, the gunman locked, bolted and put a chair against the door. Elliott stated that the defendant sat in the chair and told the gunman, "Go get the thing." The gunman then passed the gun to the defendant and left the room. The gunman later returned to the motel room with a crowbar and a jar of vaseline, which he laid on the table. Elliott testified that the defendant and the gunman threatened that if she did not do everything that they said they would hurt her. Elliott was ordered to take her clothes off and to sit on the bed. The gunman went into the bathroom and returned naked. Then the defendant went into the bathroom and took his clothes off. The defendant returned from the bathroom and sat in a chair holding the gun. Elliott testified that the gunman and the

defendant then forced her to repeatedly have anal, vaginal and oral sex interchangeably with each of them, over an extended period, while the other held the gun on her.

Elliott asserted that after the last act of forcible sexual intercourse she went to the bathroom, and when she came out of the bathroom, the defendant and the gunman were watching pornographic movies. Elliott also asserted that she was ordered to lie across the bed and the defendant and gunman compelled her to watch the pornographic movies. At the conclusion of the pornographic movies, Elliott contends she again had oral, vaginal and anal sexual intercourse with the gunman, after which, Elliott related, the defendant and the gunman took turns in the bathroom washing up, and then, Elliott claimed, the gunman also washed her. Elliott then put her clothes on.

Again, we note that the defendant admitted renting the room and having consensual sexual intercourse with Elliott. He testified, however, that it was not by force as Elliott testified, but rather it was with her consent for an agreed amount of money.

It is questionable that the defendant would take Elliott at gunpoint to a motel, a place where they could have easily been detected, rent and register a room in his correct name and address and driver's license number, enter the room, and over a period of hours forcibly perform all forms of deviate, perverted sex acts upon Elliott which Elliott attributed to him against her will. According to Elliott, after she was repeatedly raped by the defendant and the gunman, she was ordered to watch pornographic movies. As farfetched as it is to believe that a rapist would take his victim to a motel and rent a room within which to rape her, it is even more farfetched to believe that after raping her, the rapist would order the victim to lie down and watch pornographic movies with him and thereafter wash her.

The defendant related that after he and Elliott had sex, Elliott demanded more money than the amount upon which they had agreed. The defendant testified:

"Q. And after you finished what happened?

A. Well, we got ready to go. And after I had put on my clothes I had got to the door and then she said 'Well, ain't you going to pay me,' and I said 'Yes.' So I gave her the 20 dollars. She said, '20 dollars.' She said, 'You got to pay me more than 20 dollars for all the time we stayed here.' And I said, 'That is what we agreed on and I'm not going to pay you no more.' "

The defendant stated that he then told Elliott at the motel, "If you want a ride home you'd better come on"; that Elliott, apparently angry because he refused to give her more than the $20 they had

agreed upon, declined his offer for a ride home, and he left her at the motel and drove to his home at 318 W. 51st Street, in Chicago, Illinois.

Conversely, Elliott testified that she, the gunman, and the defendant left the motel room; she was ordered to sit in the front seat of the defendant's car while the gunman sat in the backseat of the car. She stated that the defendant went to the motel office and turned in the room key, while the gunman in the backseat of the car had the gun pointed at her. When the defendant returned from the motel office, Elliott claimed that he drove her to 67th and Woodlawn, two blocks from her residence, almost the exact spot where the defendant had initially picked her up. She stated that the defendant put her out the car and returned her house keys to her. Elliott stated that the gunman told her that she would be killed if she called the police.

Elliott testified that once she was out of the car she "just stood around waiting to see if they would drive back around." Why she would wait for her alleged captors to return is a mystery. Elliott then walked half a block to the telephone and called, not the police, but a "friend of mine," Craig Grafton. The defendant suggests that Grafton was more than a mere friend, that Grafton was probably Elliott's "boyfriend," in street prostitution parlance, "her pimp." Elliott told Craig Grafton that she had been raped and asked Grafton to come over to her house and take her to the hospital. Elliott then ran two blocks to her house.

Grafton testified that at 9 a.m. on August 18, 1985, he received a phone call from Elliott, who was crying and told him that she had been raped. Thus, according to Elliott and Grafton's time calculation, Elliott had been with the defendant with force and against her will for nine hours, *i.e.,* from about midnight when he picked her up, until 9 a.m. when Elliott was released and called Grafton.

The defendant argues that Elliott was a street prostitute plying her trade and because she had spent an inordinate amount of time with him for a negligible amount of money, upon which they agreed, she (and her boyfriend) retaliated against him with this false rape accusation.

Grafton went to Elliott's apartment and took her to Jackson Park Hospital, to which the police were summoned.

Robert Flood, a Chicago police department detective, testified on direct examination that on August 18, 1985, around 9:30 a.m. Flood went to Jackson Park Hospital and spoke with Elliott. Flood testified that after talking to Elliott he then went with Elliott and Grafton to the Dunes Motel at 9401 S. Stony Island Avenue where Elliott told

him the sex acts had occurred. After contacting the motel manager, Flood related that Elliott accompanied Flood to the room where Elliott said she had been. The room had been cleaned and they then went to the motel office and examined the room registration card. The defendant's name, Alphonse Jackson, the defendant's home address, 318 W. 51st Street, Chicago, Illinois, and the defendant's driver's license number, J25000063148, were on the registration card. Flood then returned Elliott and Grafton to the hospital.

Flood testified that he then went to the address on the motel registration card, 318 W. 51st Street, and saw the defendant's car, a two-door brown Cougar, parked outside defendant's home. Flood went to the house, rang the bell and the defendant answered the door. According to the defendant, the officers initially told him that his car had been in an accident, but later told him that a girl claimed he had raped her. The defendant testified that he initially told the officers that he knew nothing about any rape, but when the officers asked him what he did the previous night, he promptly told them that he had picked up Elliott in his car and that he took her to the Dunes Motel, where she consented and agreed in exchange for money to vaginal and anal sex.

The defendant voluntarily accompanied Detective Flood to the police station. Flood testified that en route to the police station, the defendant told him and his partner that "he had picked up the girl on *** Marquette Boulevard near Stony Island Avenue, and he had taken her into a motel." Flood testified as follows:

"Q. And did he tell you anything else?

A. He told us that he believed her to be a prostitute and that he was going to pay her 20 dollars *** and that the girl told him that he was taking too long and that, I guess, a couple of hours had passed *** and that he left the motel without paying her and he left her at that location."

Dr. Mikal Ramadan testified that pursuant to his duties in the Jackson Park emergency room, on August 18, 1985, at 9 a.m., he examined Elliott. He found tenderness in the vaginal and anal areas and tenderness in the adnexal area around the ovaries. Dr. Ramadan testified that there was minimal swelling in the anal area. According to Dr. Ramadan, this evidence showed that Elliott had had sexual intercourse, which was not controverted, but rather, was indeed agreed upon by the defendant and Elliott.

It is defendant's contention for reversal that the evidence did not establish his guilt beyond a reasonable doubt. In this regard, many cases are instructive in deciding this issue. In *People v.*

*Dougard* (1959), 16 Ill. 2d 603, 607, in reversing a conviction because of the insufficiency of the evidence, the court held that in a criminal case it is the duty of a reviewing court to review the evidence and if there is not sufficient credible evidence, or if the evidence is improbable or unsatisfactory, for if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that the defendant is guilty, the conviction will be reversed. The court further pointed out in *Dougard* that it is also the duty of the reviewing court to resolve all facts and circumstances in evidence on the theory of innocence rather than guilt if that reasonably may be done, and where the entire record leaves a grave and substantial doubt of the guilt of the defendant, the court will not hesitate to reverse the conviction.

In *People v. Rossililli* (1962), 24 Ill. 2d 341, the court reversed the defendant's rape conviction, stating that in a rape case, unless the testimony is clear and convincing, the testimony of the complaining witness must be corroborated by other facts and circumstances in evidence.

The court also reversed the rape conviction in *People v. Scott* (1950), 407 Ill. 301, because of the insufficiency of the evidence. The court held that it is a fundamental rule that in order to prove the charge of forcible rape, there must be evidence to show that the act was committed by force and against the complainant's will.

In *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651, the court reversed the defendant's conviction of rape, deviate sexual assault and robbery. The court stated:

> "Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases. Moreover, in such cases it is the duty of a reviewing court not only to carefully review the evidence, but to reverse the judgment if that evidence does not remove all reasonable doubt and create an abiding conviction that the defendant is guilty of the crime alleged." 20 Ill. App. 3d at 847.

In *People v. Taylor* (1971), 48 Ill. 2d 91, the court reversed defendant's rape conviction. The court stated:

> "[R]eviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, and it is the duty of the reviewing court not only to consider the evidence carefully but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged." 48 Ill. 2d at 98.

As directed by these foregoing authorities, we have carefully reviewed the evidence, and we conclude that the State failed to prove beyond a reasonable doubt that there was a rape or that the defendant committed the offense of aggravated criminal sexual assault, aggravated kidnapping and unlawful restraint. The complainant's version of the morning's events reeks more of fantasy than fact. We therefore reverse the convictions.

Reversed.

LORENZ, J., concurs.

PRESIDING JUSTICE MURRAY, specially concurring:
I agree with the majority that the State's evidence does not disclose that defendant was guilty of the various crimes he was found guilty of in the majority's opinion. However, I think the inference that the complaining witness, a mother of young children, is or was a prostitute is unfair and unjust.