THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES E. SHOCKLEY, Defendant-Appellant.

Second District    No. 2—88—0381

Opinion filed March 16, 1990.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Daniel D. Yuhas and Jeffrey Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Robert J. Biderman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, James Shockley, was charged by indictment with aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(2)). The grand jury later amended the indictment to charge defendant with criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)). Following a jury trial, defendant was found guilty and was sentenced to 10 years' imprisonment. On appeal, defendant contends that: (1) he was not proved guilty beyond a reasonable doubt; and (2) his right to confront witnesses was violated by not requiring the State to disclose the complainant's new address. We affirm.

At trial, the State's first witness was the complainant, Fritzi. Fritzi testified that on August 8, 1987, she went to the Wrens Roost bar with two friends, John Cerqua and Janice Cohen. Fritzi stated that they arrived at the bar at approximately 4:30 p.m., sat down at a table, and were joined shortly thereafter by a person known as "James." Fritzi began to talk to James about his tattoo on his arm depicting "a naked lady with a dragon wrapped around it." James told her that he was from Kentucky and currently lived in Aurora, Illinois. Fritzi later identified James as being the defendant in this case.

Fritzi further testified that they stayed at the Wrens Roost for

approximately one hour and drank two beers each. After leaving the bar, Fritzi, her two friends, and defendant went to a nearby bar, the Cove. Fritzi and defendant each had one beer at the Cove and left approximately 30 to 45 minutes later to visit defendant's friend in a nearby apartment. Fritzi stated that both of her friends accompanied her and defendant to the apartment in defendant's automobile, although defendant was the only one to actually go into the apartment. Defendant parked the car in an alley and returned approximately 15 minutes later and drove to another bar, Bernie's.

Fritzi stated that the four of them stayed at Bernie's for an hour or more, consuming approximately two beers each. Fritzi saw a friend of hers, Dave Dieters, at the bar, but did not talk with him. Shortly thereafter, Fritzi left Bernie's with defendant to go to another bar, John's B & B. John and Janice both stayed at Bernie's and did not go to John's B & B. Fritzi testified that she rode with defendant in his car to get to John's B & B, arriving at approximately 8:30 p.m. Fritzi and defendant each drank two or three beers at John's B & B before leaving at approximately 9:30 p.m. to visit another bar, Nickels.

Fritzi stated that defendant stopped for gas on the way to Nickels and purchased a six-pack of beer. Defendant told Fritzi that he wanted to drive around and drink the beer, but she requested that he take her home. Defendant continued to drive around and eventually stopped at the Hesed House, which Fritzi described as a shelter for the homeless to stay in the winter. After arriving at the house, Fritzi stated that she saw a blue pickup truck nearby and started to run toward it. However, defendant stopped her, grabbed her mouth and told her to stop screaming. Defendant told her that he had a gun, pushed her onto the ground and removed her pants. Defendant then got on top of her and engaged in sexual intercourse with her. Fritzi stated that she was afraid that defendant would kill her if she did not cooperate with him.

Fritzi further stated that defendant drove her into downtown Aurora following the sexual activity. Defendant dropped her off approximately one block from the Wrens Roost, and Fritzi walked toward the bar. She saw her friends John and Janice standing outside of the bar and told them that she had been raped. She asked John to call the police, and an officer arrived approximately 10 minutes later. The officer drove Fritzi back to the Hesed House before taking her to the hospital to receive medical treatment. Fritzi stated that the blue pickup truck was still parked at the Hesed House when she returned. Fritzi testified that her foot hurt after the attack, but X rays did not reveal any broken bones.

On cross-examination, Fritzi testified that she participated in a lineup in which she had an opportunity to hear and see five individuals. Fritzi stated that she did not think defendant was one of the five persons, "[b]ut if he is, it's [sic] No. 2." After being shown a picture of the lineup, she agreed with defense counsel's statement that defendant "is the only person in this courtroom who's in the picture." She also stated that she spoke with Detective Deborah Porter of the Aurora police department on August 12, 1987, and told her that someone removed some money from her pocket after the incident. However, she was unsure of the amount of the money taken from her, although she was sure that it was less than $30.

John Cerqua testified that he went to a "couple of bars" with Fritzi and Janice Cohen on August 8, 1987. Cerqua stated that they met a man known as "Hillbilly James" at the Wrens Roost. Cerqua later identified defendant as the man he knew as Hillbilly James. After visiting two bars, Fritzi and defendant went on their own to go to another bar. Cerqua stated that he and Cohen did not accompany them because they did not have any more money.

Cerqua further testified that he and Cohen went back to the Wrens Roost at approximately 11 p.m. and saw Fritzi walking toward the bar. Cerqua described Fritzi as "all shooken [sic] up, crying and walking with a limp." Cerqua also noticed that Fritzi had mud on the back of her shirt and that her jeans and feet were dirty. Cerqua stated that Fritzi did not have mud or dirt on her before she went to the bar with defendant. Fritzi told Cerqua that she had been raped, and he went inside the bar to call the police. Cerqua stated that he went in the police car with Fritzi and Cohen to visit the rape scene and then to the hospital.

Cerqua stated that he, along with Dave Dieters, saw defendant again on August 11, 1987. Cerqua noticed defendant "peeking around the corner" near the Wrens Roost, and he began to chase after defendant. Cerqua chased defendant into an apartment building and waited for the police to arrive. Cerqua stated that defendant left the apartment building after the police arrived and began to talk with the officers.

The State's next witness, Dave Dieters, testified that he saw defendant with Fritzi at Bernie's Bar on August 8, 1987. Dieters stated that he was a friend of Fritzi's but did not talk with her because she was with defendant at the bar. Dieters did not see Fritzi again that night.

Dieters also testified that he saw defendant again on August 11, 1987. Dieters stated that he "chased down" a police officer, explained

what was happening, and began to run after defendant with John Cerqua. Dieters did not see defendant enter the apartment building, but did observe him leave the building and begin to talk to the police officers.

Officer Danny Crissip of the Aurora police department testified that he was directed to investigate a possible sexual assault on August 8, 1987, at approximately 11 p.m. After arriving at the Wrens Roost, Officer Crissip saw Fritzi and was told that she had just been raped. Fritzi also provided a description of her attacker to Officer Crissip. Officer Crissip noticed that Fritzi had some red marks on her face, that her clothes were dirty and in disarray, and that she appeared to be "quite upset." Officer Crissip took Fritzi to the Hesed House before taking her to the hospital. He testified that he did not see any cars at the Hesed House for the 5 to 10 minutes that they were there. On cross-examination, Crissip did not recall Fritzi mentioning anything about a pickup truck at the Hesed House, and he did not recall seeing a truck there during his investigation that night.

Sergeant Raymond Weaver of the Aurora police department testified that he was working on August 11, 1987, at approximately 9 p.m. when he was "flagged down" by three persons in downtown Aurora. Sergeant Weaver stated that he went to a nearby apartment building to question "a suspect in a rape." The suspect was later identified as defendant. Sergeant Weaver then called for another squad car to take defendant to the police station for questioning.

Detective Deborah Porter of the Aurora police department testified that she interviewed Fritzi on August 12, 1987, at the police station. Detective Porter stated that Fritzi told her that defendant took $30 out of her pocket on the night of the incident. Fritzi also told her that she suffered a "hairline fracture" of her foot.

Mary Christian, a nurse at Copley Memorial Hospital in Aurora, testified that she treated Fritzi in the emergency room on August 8, 1987, at approximately 11:35 p.m. Nurse Christian stated that she examined Fritzi and prepared a Vitullo evidence kit, which she gave to the police. She also stated that she did not believe that Fritzi was intoxicated that evening, so she did not test Fritzi's blood sample for its alcohol content. However, on cross-examination, she noted that the treating physician, Dr. Sarroca, wrote "ETOH" in his notes on Fritzi. Nurse Christian stated that ETOH is an abbreviation for alcohol.

Dr. Manuel Sarroca testified that he was an emergency room physician at Copley Memorial Hospital in Aurora. Dr. Sarroca stated that he treated Fritzi on August 8, 1987, and noticed that she had a contusion of the lip, a small cut on her finger, and a sore foot. An X ray

was taken of Fritzi's foot but found no fracture or other bone injury. Dr. Sarroca also performed a pelvic examination on Fritzi in which he found no injuries to the genital area, but did notice "some small dirt particles on the outside, also inside the vagina that looked like some of which looked like either a piece of grass or a piece of leaf."

Arlene Hall, a forensic serologist for the Illinois State Police department, testified that she tested the contents of the Vitullo evidence kit used in this case, along with a sample of defendant's blood. Hall noted that both Fritzi and defendant were classified as ABO secretors, but testing revealed no activity on the ABO typing. Hall explained that she was unable to make a conclusion as to the source of the semen sample on Fritzi's vaginal swab. It was Hall's opinion that no male could be excluded as the source of the seminal material based on the tests that she performed.

The first defense witness, James Davis, testified that he worked with defendant and lived at the apartment where defendant ran to after being chased on August 11, 1987. Davis let defendant into the apartment and looked out the window to see men with "sticks and things" in their hands. Davis then saw police officers arrive. Defendant then left the apartment, telling Davis that "I'll [defendant] go down and get this mess cleared up."

Pam Shockley, defendant's wife, testified that she took her six-year-old son to a drive-in movie on August 8, 1987. When she returned from the movie at approximately 10 p.m., she saw defendant sleeping on the sofa. Pam left her home a short time later and returned about 10 minutes later to find defendant still asleep on the sofa.

Defendant testified at trial that he went to the Wrens Roost on August 8, 1987, and began to talk with a "Spanish gentleman" and "two ladies." Defendant drank beer with the three people at the Wrens Roost before moving on to the Cove and Bernie's. Around 8 p.m., defendant and Fritzi left Bernie's and went to John's B & B, where they continued to drink beer. Defendant described Fritzi as being "very intoxicated" by the time they arrived at John's B & B. Defendant stated that he went to the bathroom soon after arriving at John's B & B, and upon returning to the table noticed that a "Spanish guy" had sat down at the table and had three lines of cocaine drawn out on the table. Defendant stated that he did not sit down at the table, but instead left the bar and went home by himself. Defendant denied raping anyone on August 8, 1987.

On cross-examination, defendant testified that both he and Fritzi were intoxicated by the time that they arrived at John's B & B.

Defendant again stated that he left the bar, without Fritzi, after seeing the cocaine on the table. He noticed that Fritzi's clothes were clean when he left the bar. Defendant denied going to the Hesed House at any time on August 8, 1987, and further denied striking Fritzi or engaging in sexual intercourse with her. In addition, defendant admitted that he had a tattoo of a naked woman and a serpent on his arm, which he showed to the jury.

Defendant further stated that he went back to the Wrens Roost on August 11, 1987. As he was leaving the bar, he noticed three unidentified persons running toward him with sticks in their hands. Defendant ran toward James Davis' apartment, nearly being hit in the head by a rock thrown by one of the men chasing him. Defendant stated that he waited in Davis' apartment for the police to arrive, at which time he went downstairs and told the police that he wanted to "file charges on these people."

At the conclusion of defendant's testimony, the defense rested. Following closing arguments, the jury returned a verdict finding defendant guilty of criminal sexual assault. The trial court then sentenced defendant to 10 years' imprisonment. Defendant filed a timely notice of appeal.

Defendant's first contention on appeal is that he was not proved guilty beyond a reasonable doubt. In particular, defendant argues that Fritzi's testimony was not clear and convincing and was not substantially corroborated by other witnesses. As such, defendant contends that his conviction must be reversed. We disagree.

■■ ■ It is our opinion that the evidence in the present case was sufficient to find defendant guilty beyond a reasonable doubt. In a prosecution for criminal sexual assault, the complainant's testimony must be clear and convincing or corroborated by other facts or evidence. (*People v. Gramc* (1989), 181 Ill. App. 3d 729, 737; *People v. Jackson* (1989), 178 Ill. App. 3d 785, 793.) However, clear and convincing evidence is not synonymous with uncontradicted or unimpeached testimony. (*People v. Henne* (1988), 165 Ill. App. 3d 315, 323-24; *People v. Redman* (1986), 141 Ill. App. 3d 691, 703.) Minor variances or discrepancies in the complainant's testimony may occur and do not constitute grounds for reversal. (*People v. DuPree* (1987), 161 Ill. App. 3d 951, 961.) Instead, such discrepancies affect only the complainant's credibility. (*DuPree*, 161 Ill. App. 3d at 961.) It is for the trier of fact to weigh any discrepancies, and if they are so minor as to not detract from the reasonableness of her testimony, her testimony may be found to be clear and convincing. *Henne*, 165 Ill. App. 3d at 324; *Redman*, 141 Ill. App. 3d at 703.

In the case at bar, defendant argues that the complainant's testimony was not clear and convincing since it conflicted with other evidence. Specifically, defendant points out that Fritzi's testimony conflicted with the testimony of Aurora police officers to whom she made statements. At trial, Fritzi testified that she saw a blue pickup truck at the Hesed House during the offense and further stated that Officer Crissip spoke to a person in the pickup during his investigation later in the night. However, Officer Crissip testified that he did not see a pickup truck at the Hesed House during his investigation.

Defendant also points out inconsistencies in Fritzi's testimony regarding the time when defendant arrived at the Wren's Roost, whether defendant stopped his car in an alley before proceeding to the Cove, whether her foot was injured during the attack, and whether her attacker took any money from her following the attack. Defendant also asserts that Fritzi's inability to positively identify him at a lineup held on November 3, 1987, rendered her testimony less than clear and convincing.

Defendant contends that *People v. Byas* (1983), 117 Ill. App. 3d 979, supports his argument that Fritzi's uncertainty at the lineup rendered her testimony less than clear and convincing. In *Byas*, the victim had trouble identifying the defendant during a photographic display, a lineup, and at the preliminary hearing. She was also unable to provide an accurate description of her attacker to the police. Her only positive identification of the defendant came at trial, and only after being shown three photographs of the defendant. (*Byas*, 117 Ill. App. 3d at 985.) The appellate court reversed the defendant's conviction, holding that the evidence of the defendant's identity was insufficient to sustain his conviction. 117 Ill. App. 3d at 984.

We find the *Byas* decision to be readily distinguishable from the identification issue present in this case. A review of the record indicates that defendant's appearance changed from the time of the attack to the time of the lineup. Fritzi testified that defendant had a moustache at the lineup, which he did not have on the night of the assault. In addition, she stated that he was thinner and had longer hair on the date of the lineup. Fritzi also stated that she was "extremely nervous, not real sure of myself" at the time of the lineup, mainly due to being photographed and questioned by defendant's attorney during the lineup. Fritzi stated that she thought that person number two (defendant) at the lineup was her assailant, but she couldn't be sure.

It is well settled that any alleged discrepancies or inconsistencies in identification testimony go to the weight and credibility of the

testimony, a function properly left for the trier of fact. (*People v. Johnson* (1986), 114 Ill. 2d 170, 190, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618; *People v. Graham* (1989), 179 Ill. App. 3d 496, 506.) While we agree that a conviction cannot be sustained based solely on a doubtful or uncertain identification (*Graham*, 179 Ill. App. 3d at 506), we do not believe such to be the case under the facts here. While there was some doubt or uncertainty regarding Fritzi's identification of defendant at the lineup, it does not require reversal in this instance. The record indicates that defendant's appearance had changed from the time of the assault to the lineup date. In addition, Fritzi was able to provide a description of defendant to Officer Crissip on the night of the attack and was able to positively identify defendant at trial as her assailant. Fritzi also stated that she noticed a tattoo of "a naked lady with a dragon" on defendant's arm, which in fact defendant displayed to the jury during his testimony. Under these facts, Fritzi's identification of defendant was, unlike *Byas*, not so vague and uncertain to render her testimony less than clear and convincing.

As to the other inconsistencies pointed out by defendant, it is our opinion that they do not detract from the reasonableness of Fritzi's version of the events occurring on August 8, 1987. Inconsistencies regarding the time that defendant arrived at the bar, whether he stopped his car en route to another bar, and whether any money was taken from the pocket in Fritzi's jeans were collateral matters not relating to the specifics of the sexual assault. (See *DuPree*, 161 Ill. App. 3d at 961.) Fritzi's testimony concerning her injured foot was substantiated by Dr. Sarroca, who testified that X rays were taken of her foot due to her complaint of pain. We find little or no significance to the fact that Fritzi did not inform the police officers that her foot was injured during the assault.

With respect to the inconsistency concerning the pickup truck at the Hesed House, we again disagree with defendant's characterization of the significance of the discrepancy. It is entirely possible that Officer Crissip did not notice the pickup truck during his brief investigation at the Hesed House. In any event, situations like this concern matters of credibility which are properly reserved for the trier of fact to decide. We do not believe that the inconsistencies sufficiently detracted from the reasonableness of Fritzi's testimony to render her testimony unclear and unconvincing.

■ Defendant also argues that Fritzi's testimony was not substantially corroborated by other witnesses. In a sexual assault case, the complainant's testimony must be corroborated by other facts and

circumstances in evidence unless the testimony is clear and convincing. (*DuPree*, 161 Ill. App. 3d at 960; *People v. Wright* (1986), 147 Ill. App. 3d 302, 313.) While we have already determined that the complainant's testimony was clear and convincing in this case, we also note that her testimony was sufficiently corroborated by her prompt complaint of the incident. *Gramc*, 181 Ill. App. 3d at 738; *People v. Server* (1986), 148 Ill. App. 3d 888, 895, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131.

Defendant also argues that Fritzi's testimony in this case was "incredible and beyond belief." Defendant asserts that it is "difficult to conceive" that he would drop her off only one block from the Wrens Roost after sexually assaulting her and then return to the Wrens Roost three days later. Defendant cites *People v. Jackson* (1989), 178 Ill. App. 3d 785, and *People v. Wright* (1986), 147 Ill. App. 3d 302, to support his contention.

In *Jackson*, the appellate court reversed the defendant's conviction of sexual assault, noting that it was "farfetched" for the defendant to take the complainant to a motel room, register for the room using his correct name, address, and driver's license number, and then forcibly rape her. (*Jackson*, 178 Ill. App. 3d at 789.) In *Wright*, the appellate court reversed the defendant's rape conviction, finding that the victim's version of the events "has greater value as fiction than as credible evidence." (*Wright*, 147 Ill. App. 3d at 318.) The court also described the victim's testimony as "highly unlikely, improbable and unbelievable." 147 Ill. App. 3d at 318.

■ We disagree with defendant's assertion that the evidence in the case at bar is at all similar to that presented in *Jackson* or *Wright*. Again, we agree with defendant that the complainant's testimony contained some inconsistencies in this case. However, we fail to perceive how these inconsistencies transform the complainant's testimony into "fiction" or render it highly unlikely, improbable or unbelievable.

■ A court of review will not disturb a conviction unless the evidence is so palpably contrary to a guilty determination, or is so unreasonable or improbable that it raises a reasonable doubt of the defendant's guilt. (*DuPree*, 161 Ill. App. 3d at 962.) In the case at bar, Fritzi made a prompt complaint to her friends and the police, described her attacker to the police, and gave a description of the incident to the medical personnel in the emergency room. In addition, Dr. Saccora found dirt particles on the outside of Fritzi's genitalia and a piece of a leaf or grass inside her vagina. Testimony at trial also indicated that Fritzi's blouse and jeans contained dirt after the incident, although

they were clean earlier in the evening. Even with the inconsistencies outlined above, we cannot find that the jury's verdict was so unreasonable or improbable that it raises a reasonable doubt of defendant's guilt in this case.

Defendant next contends that his right to confront witnesses was violated when the State was not required to disclose the complainant's new address. Defendant argues that the failure to require disclosure in this case prevented him from conducting a sufficient pretrial investigation to effectively challenge complainant's credibility at trial. As such, defendant asserts that his right to confrontation was violated and this requires a reversal of his conviction.

Before trial, the State filed a motion requesting the trial court to deny disclosure of Fritzi's new address to defendant. The motion was based upon Supreme Court Rules 412(i) and 415(d) (107 Ill. 2d Rules 412(i), 415(d)). In the motion, the State alleged that Fritzi received a telephone call from a person who identified herself as defendant's wife and that his wife requested that Fritzi not continue to prosecute the case. Since receiving the phone call, Fritzi changed residences and obtained an unlisted telephone number. The State argued in the motion that "there is substantial risk of harm, intimidation, bribery, and unnecessary embarrassment to the victim if her new address is released to the defendant." Attached to the motion was Fritzi's affidavit, in which she stated:

> "That during this conversation, the woman who said she was Pam Shockley suggested that I could drop charges or not appear in court, that she did not think her husband should go to jail but should receive counselling, and that he had just gotten out of jail in Kentucky in addition to other things."

The trial court conducted a hearing on the State's motion. Defendant argued that he needed the address to allow him to investigate Fritzi's reputation for truthfulness and veracity in her community. The trial court disagreed and granted the State's motion, stating that the State was required to disclose her previous address, but not her new address. The court also stated that "the State will make the victim available to the defense."

█ Defendant argues that the trial court's ruling deprived him of an opportunity to conduct a sufficient pretrial investigation to effectively challenge Fritzi's credibility at trial. Defendant notes that section 114—9(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 114—9(a)) allows a defendant to obtain a "list of prosecution witnesses and their last known addresses" from the State. While defendant agrees with the State that Supreme Court

Rule 412(i) (107 Ill. 2d R. 412(i)) can, in certain circumstances, allow a court to deny disclosure, he argues that this is not such a case.

Supreme Court Rule 412(i) provides, in pertinent part:

"The court may deny disclosure *** if it finds that there is substantial risk to any person of physical harm, intimidation, bribery, economic reprisals, or unnecessary annoyance or embarrassment resulting from such disclosure which outweighs any usefulness of the disclosure to counsel." (107 Ill. 2d R. 412(i).)

The purpose of this rule is to assist the defendant in the investigation of the witness and to prevent surprise or unfair advantage which prejudices the defendant at trial. (*People v. Morissette* (1986), 150 Ill. App. 3d 431, 440; *People v. Smith* (1985), 139 Ill. App. 3d 21, 29.) It is incumbent upon the defendant to show that surprise or other prejudice resulted from the State's failure to supply the witness' address. *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 784.

■ It is our opinion that the trial court properly denied defendant's request to obtain Fritzi's new address in this case. The court could properly conclude that providing defendant with Fritzi's new address could result in "unnecessary annoyance or embarrassment," especially after considering that defendant's wife apparently tried to get Fritzi to stop the prosecution of the case.

Furthermore, defendant has failed to demonstrate how the nondisclosure of Fritzi's new address prejudiced him at trial. Defendant argued that he needed her new address to investigate her reputation for truth and veracity in her new neighborhood in order to effectively cross-examine her. However, we fail to see how any information concerning her reputation for truth and veracity could reasonably be expected to be obtained from her new neighbors. The trial court ordered the State to disclose Fritzi's last address before her new address. Defendant was able to effectively cross-examine Fritzi at trial, including eliciting some inconsistencies in her testimony. Defendant has failed to show how the outcome of the trial would have been different had he been provided with Fritzi's new address. (See *Gutierrez*, 136 Ill. App. 3d at 784-85.) Thus, we find no error in the trial court's ruling denying defendant disclosure of Fritzi's new address.

For the above-stated reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

REINHARD and DUNN, JJ., concur.